IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 13, 2014 Session

**LINDA LASETER, Individually and on behalf of her deceased mother, ALICE H. CORR v. J. MARTIN REGAN, JR., in his capacity as Personal Representative of the ESTATE OF FERNANDO HERRERA, M.D.**

Direct Appeal from the Circuit Court for Shelby County
No. CT-002427-08     Donna Fields, Judge

No. W2013-02105-COA-R3-CV - Filed July 24, 2014

This appeal involves a defendant's attempts to discover certain financial information from the plaintiff's medical expert in order to facilitate an inquiry into potential bias. The trial court entered several orders requiring the expert witness to provide the requested financial information, which related to his income and compensation, but the expert witness repeatedly failed to comply with the trial court's orders. The trial court also ruled that the defendant would be permitted to question the expert witness about certain financial information during cross-examination at trial, and the expert witness communicated to the trial judge that he would refuse to answer any such questions. The trial court eventually excluded the medical expert as a witness and allowed the plaintiff time to find a replacement expert. When the plaintiff failed to identify another expert witness within the time allowed, the trial court dismissed the complaint. The plaintiff appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., and PAUL G. SUMMERS, SR. J., joined.

Al H. Thomas, Aaron L. Thomas, Memphis, Tennessee, for the appellant, Linda Laseter, Individually and on behalf of her deceased mother, Alice H. Corr

Katherine M. Anderson, Hugh Francis, David M. Cook, Albert G. McLean, Memphis, Tennessee, for the appellee, J. Martin Regan, Jr., in his capacity as Personal Representative of the Estate of Fernando Herrera, M.D.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

This case involves a narrow issue, but the procedural history before the trial court relevant to the issue is somewhat tortured and incredibly lengthy.

A "Complaint for Medical Malpractice"was filed on May 20, 2008, by Linda Laseter, individually and on behalf of her deceased mother, Alice H. Corr, against Kishore K Arcot, M.D., Memphis Cardiology, P.L.C., and Fernando Herrera, M.D.  The complaint basically alleged that there was "an inappropriate rush to repair an abdominal aortic aneurysm, which was in fact non-emergent," and "subsequent to repair of the aneurysm the patient developed severe metabolic acidosis and kidney failure and died."  Defendants Arcot and Memphis Cardiology were eventually dismissed from the case on summary judgment, and they are not at issue on appeal.  The only defendant at issue on appeal is Dr. Herrera ("Defendant"), who is a cardiovascular surgeon.

Defendant filed an answer to the complaint, and discovery ensued.  On October 8, 2009, Defendant filed a motion for summary judgment, which was supported by his own affidavit, in which he stated that he had complied in all respects with the recognized standard of acceptable professional practice.  In response to the motion for summary judgment, Plaintiff filed the affidavit of Martin Evans, M.D., a medical doctor practicing as a general and vascular surgeon in Richmond, Virginia.  Dr. Evans opined that Defendant did not comply with the recognized standard of acceptable professional practice in his treatment of the patient.

On January 15, 2010, defense counsel filed and served on plaintiff's counsel a notice to take the discovery deposition of Dr. Evans.  The notice of deposition requested that plaintiff have Dr. Evans produce at his deposition certain documents related to the income he had earned as an expert witness, including his schedule of charges for work as a witness in a lawsuit, all income received from reviewing cases, consulting or testifying in connection with lawsuits since January 1, 2000, and 1099s and related documents reflecting his income for medical/legal review for the years 2000 to 2010.  Plaintiff's counsel did not object to the document request, but Dr. Evans did not produce the documents at his discovery deposition on April 28, 2010.  When Dr. Evans was asked during his deposition how much income he earns annually from serving as an expert witness, he said he did not know, and when asked to give an estimate for the last three years, he said he could not do so.  He did estimate that fifteen to twenty percent of his income comes from expert activity, but he said he did not know "the actual amount of dollars."

After the entry of several scheduling orders and amended scheduling orders, the case was scheduled for trial on August 20, 2012. On January 4, 2012, Defendant filed a motion to compel production of the documents that were requested prior to Dr. Evans' discovery deposition but not produced. According to Defendant's motion, he was unable to find "any Tennessee appellate court case, reported or unreported," addressing the propriety of requiring the production of information and documents pertaining to an expert witness's income from serving as a witness in medical-legal matters. However, Defendant's motion asserted that numerous courts in other jurisdictions had held that it is proper for an expert witness to be examined as to his or her expert witness income and the percentage of his or her total income that is derived from serving as an expert witness. Defendant argued that the requested information was relevant "because it shows bias or prejudice since a person who testifies as an expert witness on a frequent basis may sometimes be perceived as a 'professional witness' which in and of itself goes to the credibility of the witness." He pointed to Dr. Evans' deposition testimony that he has been testifying as an expert witness for thirty years, he has served as an expert witness for the particular attorneys representing plaintiff in this case for over fifteen years, he has reviewed between twelve and twenty cases per year for the past twenty years, he presently has between ten and fifty open files, and he estimated that fifteen to twenty percent of his income is derived from serving as an expert witness. Defendant argued that the aforementioned documents related to Dr. Evans' expert witness income were discoverable, but in the event that the court determined that the request for information was too broad, Defendant asked the court to modify the request and to require production of the documents the court deemed appropriate.

Plaintiff filed a response in opposition to Defendant's motion to compel production of the documents, asserting that the motion should be denied because she, personally, did not have control of the requested documents, and even if she did, the request should be quashed as unduly burdensome. She contended that the requested information was "maximally burdensome to Plaintiff because Dr. Evans will choose to retract his willingness to testify rather than suffer the invasion of privacy inherent in the rummaging through his finances." Plaintiff argued that expert witnesses should not be required to produce such financial information on a routine basis, and she claimed that there were no suspicious circumstances or grounds for deeming Dr. Evans a professional witness or questioning his impartiality.

The trial court held a hearing on the motion to compel production of the documents on March 2, 2012. Counsel for the Plaintiff insisted that the documents regarding Dr. Evans' income were not in Plaintiff's possession, custody, or control, and were not otherwise accessible to her. Defense counsel argued that Plaintiff had the ability to obtain the documents from her expert, Dr. Evans, but in the event that the court disagreed, Defendant requested leave of court to seek commission of an out-of-state subpoena duces tecum to serve on Dr. Evans in order to obtain the documents. The trial judge announced that she would

deny the present motion to compel because the documents related to Dr. Evans' income were not in Plaintiff's possession. However, the trial judge also expressed her opinion that the requested information was "relevant and certainly discoverable." The trial judge asked Plaintiff's counsel if he agreed that the requested information was relevant to show bias, to which he responded, "No question. It's relevant. It's relevant for the jury to gauge to determine what the – what's at stake for this expert here in this case in order to determine possible bias. It's definitely discoverable." However, Plaintiff's counsel went on to argue that the privacy interests of expert witnesses must be considered as well. He claimed that other courts that have attempted to balance these interests have concluded that there must be a threshold showing of suspicious circumstances regarding a particular expert before this type of discovery is allowed. The trial judge remarked that an expert witness with a thirty-year history and ten to fifty current cases "sort of has a red flag that says professional expert to me," and it raised doubts in her mind about whether Dr. Evans truly earns only fifteen to twenty percent of his income from testifying. The judge also noted that there is a difference between what is discoverable and what is admissible at trial. The trial judge indicated that if an examination of Dr. Evans' income information revealed that he actually earns more than fifteen to twenty percent of his income from testifying as an expert, she would allow defense counsel to question Dr. Evans about the discrepancy in his testimony at trial. However, she would not allow the jury to hear Dr. Evans' gross income. Ultimately, the trial judge directed defense counsel to file a petition for commission of a subpoena duces tecum, and she instructed Plaintiff's counsel to file a response. The judge indicated that she would grant the petition for the subpoena unless Plaintiff's counsel could convince her that doing so was improper. However, the judge opined that requesting income information from the past ten years was too burdensome, and she suggested that the subpoena duces tecum should require the production of information from the past five years instead. She also suggested that the parties agree to the production of an affidavit from Dr. Evans' accountant stating Dr. Evans precise income figures rather than requiring the production of documents that would potentially reveal investment income and other irrelevant information.

After the hearing, the trial court entered an order denying Defendant's motion to compel production of the documents because they were not in Plaintiff's control. As directed, Defendant filed a "Motion for Issuance of Commission for Issuance of Out-of-State Subpoena Duces Tecum," asking the court to issue a commission to the clerk of a circuit court in Virginia, requesting issuance of a subpoena duces tecum to be served on Dr. Evans, which would command him to produce the documents at issue and to appear at a supplemental deposition. Defendant argued that the requested information was discoverable and relevant to the issue of Dr. Evans' bias and credibility, or, at the very least, reasonably calculated to lead to the discovery of admissible evidence regarding Dr. Evans' bias and credibility. Along with his petition, Defendant submitted a LEXIS/NEXIS Expert Witness Profile, which indicated that Dr. Evans had been disclosed as an expert witness in 179 cases

in 23 different states, and in 96% of those cases, he had testified for the plaintiff. Thus, Defendant argued that Dr. Evans was "a professional witness under any reasonable definition of that term."

In response, Plaintiff argued that the proposed subpoena would only be appropriate for a professional witness.[1] However, Plaintiff continued to insist that Dr. Evans was not a professional witness but merely a "seasoned" expert witness. She claimed that routinely allowing discovery of any expert witness's income information "would be an unwarranted invasion of the expert's privacy" and constitute an unduly burdensome discovery request.

At the June 1, 2012 hearing on the motion for issuance of a subpoena, the parties agreed that an affidavit from Dr. Evans' accountant would be an acceptable means of disclosing Dr. Evans' income information. However, they disagreed as to the scope of information that should be produced in that affidavit. Plaintiff argued that the affidavit should be limited to a statement of the precise percentage of Dr. Evans' income attributable to serving as an expert witness during the past five years, with no mention of any exact income figures. Defendant argued that the affidavit should contain the exact amount of Dr. Evans' gross income and his expert witness income for the past five years, with attached 1099s confirming his expert witness income. The trial judge agreed with the Defendant that he was entitled to discover the precise figures with regard to Dr. Evans' gross income and his income from serving as an expert witness, which would not only reveal the amount of money Dr. Evans had earned from testifying but also allow Defendant to compute the percentage of his income attributable to serving as an expert, in order to confirm whether Dr. Evans' deposition testimony was accurate. Noting the upcoming trial date, just over two months from the date of the hearing, the trial judge ruled that Dr. Evans had to produce the affidavit from his accountant within two weeks, stating his total amount of income and his income from serving as an expert witness for the past five years. The trial judge ruled that Dr. Evans did not have to produce his 1099s to confirm the information. Prior to the conclusion of the hearing, Plaintiff's counsel expressed "serious doubts" that Dr. Evans would testify under those conditions, as he had already expressed to counsel that he was unwilling to disclose either the amount of income he earns from testifying as an expert or his gross income. He was only willing to have his accountant testify in terms of percentages. Nonetheless, the trial judge announced that her ruling would be applicable to the experts

_____

[1] Plaintiff again conceded that it would be appropriate to seek such information from a professional witness, recognizing in her memorandum:

An expert who makes his living through forensic activity has more at stake in the particular case than his fee from that case. His livelihood depends on his efficacy as a witness. Accordingly, the details of this bias are relevant to the jury and the expert who has chosen this livelihood has accepted this cost.

serving for both parties, in the event that Plaintiff's counsel chose to pursue obtaining income information from Defendant's expert witnesses. She also said that the affidavit from the accountant was not to be filed with the court; instead, it would be provided by Plaintiff's counsel directly to defense counsel. An order to this effect was entered on June 12, 2012, requiring Plaintiff's counsel to produce to Defendant's counsel, within two weeks, an affidavit from Dr. Evans' accountant setting forth his income from testifying or participating in lawsuits for the past five years, in addition to his total gross income from the treatment and care of patients during those years. The accountant's charges for preparation of the affidavit were to be paid by Defendant. The affidavit itself would be designated "confidential," it would be provided to opposing counsel for use in this litigation only, and it could not be disclosed to anyone other than defense counsel, the trial judge, and their staff who were working on the case. The order stated that the information contained in the affidavit "shall be used solely for the purpose of verifying or impeaching the expert's testimony within the context of this litigation and may be used at trial only if permitted to do so by subsequent order of the Court." The order also stated that Defendant must produce affidavits of the same type if Plaintiff chose to pursue such information from Defendant's experts.

Two weeks came and went, and Plaintiff did not produce the court-ordered affidavit. On June 28, 2012, Defendant filed a Rule 37.02 motion for sanctions[2] based upon Plaintiff's failure to comply with the court order. Defendant sought exclusion of Dr. Evans as a witness in this case due to his failure to comply with the June 12 court order. Defendant also sought dismissal of Plaintiff's claim, upon exclusion of Dr. Evans, due to the lack of expert proof to support Plaintiff's claims.[3] The motion noted that the trial date was still set for August 20, 2012, and that Defendant had first requested the information on January 15, 2010, in the

---

[2] Rule 37.02 provides, in pertinent part:

If a deponent [or] party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
. . .
(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
. . .

Tenn. R. Civ. P. 37.02.

[3] Defendant noted that the original and supplemental deadlines for plaintiff to disclose experts, as set out in various scheduling orders, had expired, and plaintiff had disclosed no experts other than Dr. Evans.

notice of deposition.

The trial judge ordered the parties to appear before the court to address the matter on July 2, 2012, but we do not have a transcript of this hearing. According to later filings discussing the July 2 hearing, Plaintiff's counsel apparently advised the court that Dr. Evans would not comply with the June 12 order and orally requested modification of the order. It appears that the trial judge instructed Plaintiff's counsel to contact Dr. Evans and determine if he would be willing to provide his income information directly to the trial judge, for in camera review, as opposed to providing the information to defense counsel as was previously ordered. The trial judge ordered the parties to return to court the following day, July 3, after Plaintiff's counsel had an opportunity to consult with Dr. Evans.

The parties were back before the court on July 3, 2012, as instructed. Plaintiff's counsel submitted emails from Dr. Evans, in which he expressed his willingness to provide the affidavit directly to the court for in camera review, with the understanding that the data was "for her eyes only." The trial judge then ruled that Dr. Evans could provide the court-ordered affidavit directly to her, via her own personal email address, for her in camera review. The trial judge announced that she would review the income information and calculate the percentage of Dr. Evans' income derived from serving as an expert witness, and if it corresponded with Dr. Evans' previous testimony that he earns fifteen to twenty percent of his income from such activity, then the trial judge would retain the affidavit, and it would not be produced to defense counsel. However, in the event that the affidavit revealed that Dr. Evans actually earns more than twenty percent of his income from testifying, the trial judge would provide the affidavit to defense counsel *unless* Dr. Evans elected to withdraw from testifying, in which case the information would not be disclosed. After this ruling regarding the affidavit was announced, counsel for Defendant argued that even if the affidavit confirmed that Dr. Evans earns between fifteen and twenty percent of his total income from serving as an expert witness, the defense should nevertheless be permitted to learn the total amount of Dr. Evans' annual expert witness income if he is considered to be a professional witness. The judge stated that defense counsel would be permitted to ask Dr. Evans about his annual expert witness income on the stand at trial. She said she would not permit defense counsel to ask questions about the previous five years while Dr. Evans was on the stand, but she would allow counsel to ask Dr. Evans how much he earned from testifying in 2010 or 2011. Plaintiff's counsel stated unequivocally that if Dr. Evans was asked such questions, about exact figures as opposed to percentages, he would refuse to answer. The trial judge said she was "trying to compromise so that we can go forward on this case" and "keep the Plaintiff's expert in there," but, she said she was not going to prevent defense counsel from asking Dr. Evans how much money he makes from testifying as an expert. She also cautioned Plaintiff's counsel, "Mr. Thomas, this is your last chance. If he wants to agree to this and you want to keep him as an expert, then I'll give him my email

address. He can give that to his accountant and the accountant can email the letter to me." After the hearing, the trial court entered an order stating that "Plaintiff's production of the affidavit described in the June 12, 2012 order will be deemed satisfied if the Court receives such affidavit (containing the ordered information for each of the years 2006, 2007, 2008, 2009, and 2010) for its in camera review by July 12, 2012." The order also incorporated the trial court's other oral rulings made during the hearing.

Shortly after the hearing, Defendant filed a motion in limine for an order requiring Dr. Evans to testify as to the amount of his expert witness income for the year 2010 when questioned about such information, and for sanctions in the event that he refused to answer such questions. Plaintiff filed a motion for continuance of the August 20 trial date, citing the ongoing dispute regarding Dr. Evans' income information and his inability to schedule Dr. Evans' deposition. On July 13, 2012, the trial court granted the motion and continued the trial date from August 20, 2012, until May 28, 2013.

The deadline for Dr. Evans to send the affidavit to the trial judge expired on July 12, 2012. On July 20, 2012, Defendant filed a second Rule 37.02 motion for sanctions, due to the failure of Plaintiff and Dr. Evans to comply with the court's two previous orders requiring production of the affidavit. Defendant noted that Plaintiff failed to comply with the June 12 order requiring production of the affidavit to defense counsel within two weeks, and despite the court's grant of a "retroactive extension" of the deadline in its July 9 order, allowing production directly to the court by July 12, the affidavit still had not been produced. The motion again noted that Defendant first sought the income information in its January 15, 2010 notice of deposition. Defendant argued that "Plaintiff ha[d] been granted at least 'two bites at the apple' and should not be allowed any more bites." Defendant again asked that the court exclude Dr. Evans as a witness and dismiss Plaintiff's claim for lack of expert proof.

Plaintiff filed a response, basically claiming that Dr. Evans was ready and willing to provide the court-ordered affidavit if the trial court would simply enter an order containing sufficient protections regarding Dr. Evans' privacy interests. She claimed that the court's prior order allowed for in camera review but did not sufficiently spell out the privacy protections, instead incorporating by reference the transcript of the trial court's oral rulings at the hearing. Plaintiff suggested that "this entire impasse could be remedied by simply modifying the [July 9] order to explicitly provide for Dr. Evans' right to recuse himself in the event that the Court's in camera review results in the conclusion that the affidavit must be provided to Defendant before Dr. Evans testifies, and the guarantee that in such circumstances, the affidavit will be returned to him without further dissemination."

At the hearing on the second motion for sanctions, on September 17, 2012, the trial judge said, "I don't know how I could be anymore plain to this doctor." She asked the attorneys to confirm her recollection that she had held four hearings on the matter and said, "I can honestly say, and I will say it in front of [defense counsel] Mr. McLean, I have done everything humanly possible to preserve this expert for you, Mr. Thomas, and he does not want to cooperate." The trial judge said that she had "bent over backwards" and "was trying to compromise" and "accommodate" Dr. Evans. She reminded Plaintiff's counsel that he had assured her at the end of each previous hearing that the affidavit would be sent, and each time it was not. The trial judge ultimately ruled that Dr. Evans would not be allowed to testify in this case due to his refusal to cooperate. That same day, the trial court entered an order granting Defendant's second Rule 37.02 motion for sanctions and excluding Dr. Evans as a witness. However, the trial court declined to dismiss Plaintiff's case and instead allowed Plaintiff ninety days to disclose a replacement expert.

On October 17, 2012, Plaintiff filed a motion to amend the trial court's order, claiming that it inaccurately stated that Dr. Evans had refused to produce the court-ordered affidavit. Plaintiff claimed that Dr. Evans was simply "waiting to provide the affidavit until a flaw that occurred in the 7/9/2012 order . . . is cured." Plaintiff claimed that Dr. Evans had been ready and willing to provide the affidavit to the court for in camera review, with the stipulation that if the court's in camera review resulted in a determination that his forensic income exceeded twenty percent of his gross income, he could then choose not to testify, and the affidavit would not be provided to Defendant. Plaintiff claimed that the trial court's order incorporating its oral ruling was "confusing" to Dr. Evans and that the "situation could have been avoided if Defendant had taken pains to present an order which explicitly addressed" the issue rather than incorporating the oral ruling. In response, Defendant argued that the court had already provided sufficient protections of Dr. Evans' privacy in its June 12 and July 9 orders.

At a hearing on October 26, 2012, the trial judge said she had gone over the issue with the parties "ad nauseum," but she ultimately agreed to enter an amended order with the express statement Dr. Evans requested. However, defense counsel pointed out that aside from the issue with production of the affidavit, the trial judge had already indicated that she would permit defense counsel to ask Dr. Evans at trial about his annual income from serving as an expert witness, and Plaintiff's counsel had unequivocally stated that Dr. Evans would refuse to answer any such questions. The trial judge reaffirmed her position on that issue, stating, "Let me be clear. I think when someone sits on the stand and holds himself out as an expert, the other party is entitled, both ways, to ask them how much they made in the year of the event or in 2000-whatever, 2012, whatever, how much they made from testifying as an expert witness." However, she gave the parties the opportunity to submit supplemental memoranda regarding that issue prior to entering an order to that effect. After considering

the supplemental authority submitted by both parties, the trial court entered an order setting aside the previous order that excluded Dr. Evans as a witness. The trial court entered an amended order that stated, in relevant part:

1. Plaintiff's production of the affidavit of Dr. Evans' accountant described in the June 12, 2012 order will be deemed satisfied if the Court receives such affidavit (containing the ordered information for each of the years 2006, 2007, 2008, 2009, and 2010) for its in camera review by December 15, 2012 to determine if Dr. Evans' income from medico-legal services exceeds 15-20% of his gross income.

2. If the Court determines from its in camera review that Dr. Evans' income from medicolegal services exceeds 15-20% of his gross income, the affidavit will be produced to defense counsel unless Dr. Evans notifies the Court that he will not testify in this cause.

3. If Dr. Evans notifies the Court that he will not testify in this cause, the Court will return the affidavit to Dr. Evans without further dissemination of the affidavit or any information contained therein.

4. Defendant will be permitted to ask Dr. Evans at trial what was the dollar amount of his expert witness income for a prior year, such as the year 2010, among others[.]

On December 14, 2012, Dr. Evans finally emailed the court-ordered affidavit to the trial judge. However, his email contained the following two "notices" for the trial judge to read prior to opening the attachment:

NOTICE #1: In the event you determine that I will not be permitted to testify in this case unless the attached financial information is provided to defense counsel, I HEREBY NOTIFY YOU NOW that I will not testify in this cause. (It is my understanding that this 'NOTICE" ensures that under no circumstances will the attached report or any of its information be disseminated beyond you. If this is incorrect, PLEASE DO NOT OPEN THE ATTACHMENT.)

NOTICE #2: Paragraph 4 of the Order permits Defendant to ask me at trial what is the dollar amount of my annual forensic income. I definitely will absolutely and politely refuse to answer such questions. If this refusal will result in my disqualification or the exclusion of my testimony, PLEASE DO

-10-

NOT OPEN THE ATTACHMENT. (Back in July, I agreed to submit my accountant's affidavit for in camera inspection in order to fulfill my commitment to testify in this case. However, if I am destined to be disqualified anyway, there is no purpose in entrusting the attached very confidential information to the Court.)

On December 17, 2012, Plaintiff filed a motion for interlocutory appeal, seeking review of the trial court's decision to allow Defendant to inquire at trial about "the dollar amount" of Dr. Evans' annual forensic income. On January 7, 2013, the trial judge wrote a letter to the attorneys in this case stating that she did not open the attachment to Dr. Evans' email because of the "notices" or conditions he imposed. The judge interpreted the first notice to say that "under no circumstances" could the affidavit be provided to defense counsel, and the judge indicated that this was not the intent of her prior rulings. In addition, the judge noted that the second notice also prevented her from opening the attachment if it was her intention to allow the Defendant to inquire into Dr. Evans' forensic income at trial. She reiterated that she had "stated all along that the Defendant would be allowed to inquire of the Plaintiff as to the amount of the total forensic income, at least around the time (years) close to the case." Therefore, the judge concluded that she was prohibited from opening the attachment pursuant to the first and second "notices" imposed by Dr. Evans.

On January 10, 2013, Defendant filed a third Rule 37.02 motion for sanctions based upon the refusal of Plaintiff and Dr. Evans to comply with the court's orders. Defendant asserted that it was "as 'plain as the fly in the buttermilk' that Dr. Evans has not and will not comply with the rulings of the Court," due to his imposition of restrictions in his email to the trial judge, and his unambiguous declaration that he did not intend to answer questions asked of him at trial regarding his income, despite the trial court's ruling that such questioning would be permitted. Defendant once again asked the court to exclude Dr. Evans as a witness and dismiss Plaintiff's claim, or in the alternative, require identification of a replacement expert witness within sixty days. Defendant cited the "torturous number of motions and hearings in this matter" and "untold amounts of time and effort" in support of his argument that Plaintiff should not be allowed any more "bites at the apple." In response, Plaintiff argued that Dr. Evans' "notices" were not inconsistent with the court's prior rulings.

Following a hearing, the trial court entered an order denying Defendant's third Rule 37.02 motion for sanctions "at this time," but it granted Plaintiff's motion for interlocutory appeal. This Court denied Plaintiff's application for interlocutory appeal on February 22, 2013, and the Tennessee Supreme Court denied Plaintiff's application for permission to appeal to that Court as well.

On March 12, 2013, Defendant filed a motion to amend the trial court's order denying his third motion for sanctions, or in the alternative, a fourth Rule 37.02 motion for sanctions. Defendant cited the "multiple failures to comply with the Court's orders" by Plaintiff and by Dr. Evans, and once again asked the court to exclude Dr. Evans as a witness and dismiss the case. On April 15, 2013, the trial court continued the May 2013 trial date until January 27, 2014.

Plaintiff filed a response to Defendant's motion for sanctions, pointing out that Dr. Evans had emailed his financial information to the court, but Plaintiff "conced[ed] that her expert, Dr. Martin Evans, will definitely not answer the questions that paragraph 4 of the Court's order of 11/15/2012 permit[ted] Defendant to ask." At a hearing on June 21, 2013, the trial judge finally advised Plaintiff that "it's time to find another expert." Plaintiff's counsel said that forty-five days would be sufficient time for him to do so, but the trial judge generously gave him sixty days. She also reminded Plaintiff's counsel of the option of taking a nonsuit. On July 2, 2013, the trial court entered an order excluding Dr. Evans as a witness in this case and requiring Plaintiff to identify a replacement expert within sixty days of the hearing. The order stated that if Plaintiff had not identified another expert witness by August 20, 2013, or taken a nonsuit, the case would be dismissed.

On September 4, 2013, the trial court entered an order of dismissal, noting that Plaintiff had not identified a replacement expert or nonsuited her claim. Plaintiff timely filed a notice of appeal.[4]

## II. ISSUES PRESENTED

This issues before us on appeal, as we perceive them, are:

1.      Whether the trial court abused its discretion in ruling that Dr. Evans was required to disclose his annual income information during discovery and during cross-examination at trial; and

2.      Whether the trial court abused its discretion in granting Defendant's motion to exclude Dr. Evans for failure to comply with the trial court's orders.

Discerning no error, we affirm the decision of the circuit court.

---

[4] Dr. Herrera died subsequent to the filing of the notice of appeal. On February 7, 2014, this Court ordered that J. Martin Regan, Jr., in his capacity as the Personal Representative of the Estate of Fernando A. Herrera, be substituted in the place of Fernando A. Herrera, M.D.

### III. STANDARD OF REVIEW

We review each of the trial court's rulings at issue under an abuse of discretion standard. "It is well settled that decisions with regard to pre-trial discovery matters rest within the sound discretion of the trial court" and "will not be reversed on appeal unless a clear abuse of discretion is demonstrated." **Benton v. Snyder**, 825 S.W.2d 409, 416 (Tenn. 1992) (citing *Paine v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979)). "We review a trial court's decision regarding the admissibility of evidence, including a ruling on a motion in limine, under an abuse of discretion standard." **Singh v. Larry Fowler Trucking, Inc.**, 390 S.W.3d 280, 284 (Tenn. Ct. App. 2012). Likewise, the "propriety, scope, manner, and control" of cross-examination of witnesses is within the discretion of the trial court and will not be interfered with in the absence of an abuse of discretion. **State v. Echols**, 382 S.W.3d 266, 285 (Tenn. 2012); **State v. Harris**, 839 S.W.2d 54, 72 (Tenn. 1992). In addition, "'[a] trial judge's exclusion of expert witness testimony is subject to an abuse of discretion review by this Court.'" **Mayo v. Shine**, 392 S.W.3d 61, 70-71 (Tenn. Ct. App. 2012) (quoting *Buckner v. Hassell*, 44 S.W.3d 78, 83 (Tenn. Ct. App. 2000)).

"An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." **Gonsewski v. Gonsewski**, 350 S.W.3d 99, 105 (Tenn. 2011) (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)). The abuse of discretion standard "does not permit an appellate court to substitute its judgment for that of the trial court, but 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives, and thus envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" **Id.** (quoting *Henderson*, 318 S.W.3d at 335). Consequently, when reviewing a discretionary decision by the trial court, "the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision." **Id.** at 105-06 (citing *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335). Still, discretionary choices "'are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" **State v. Lewis**, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 58 (2000)). An abuse of discretion will be found "when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination." **Id.**

## IV. DISCUSSION

"Discovery of expert financial and personal history is an emerging area of the law[.]" Walter R. Lancaster & Damian D. Capozzola, *Expert Witnesses in Civil Trials* § 8:23 (2013). "Medical malpractice cases arguably have the most developed case law with respect to discovery of financial information." **Id.** However, "the courts have not been uniform with respect to the degree of discovery that they will permit." **Id.**

One of the most frequently cited cases on the subject is **Wrobleski v. de Lara**, 353 Md. 509, 727 A.2d 930 (1999), which contains an excellent discussion of the role of expert witnesses and the reasons why many parties are now seeking to expose any potential bias of an expert through the use of financial information:

> Although expert witnesses play a vital, indeed a necessary, role in the trial of certain cases, the law, both here and in England, has long viewed their procurement by, and appearance on behalf of, parties to the litigation with some misgiving. As long ago as 1858, the Supreme Court noted that "opposite opinions of persons professing to be experts, may be obtained to any amount." *Winans v. New York & Erie Railroad*, 62 U.S. (21 How.) 88, 101, 16 L.Ed. 68, 71 (1858). In his 1864 treatise on Evidence, Judge Taylor observed:
>
> > "Perhaps the testimony which least deserves credit with a jury is that of *skilled witnesses*. These gentlemen are usually required to speak, not to facts, but to *opinions*; and when this is the case, it is often quite surprising to see with what facility, and to what an extent, their views can be made to correspond with the wishes or the interests of the parties who call them."
>
> John P. Taylor, *A Treatise on the Law of Evidence as Administered in England and Ireland*, 4th ed. (1864), § 50 at 72 (emphasis in original).
>
> Writing in 1893, Professor Charles Himes quoted Taylor's statement and added his own view that expert witnesses "are selected on account of their ability to express a favorable opinion, which, there is great reason to believe, is in many instances the result alone of employment and the bias growing out of it." 135 J. Franklin Inst. at 409 (1893). . . .
>
> These concerns have certainly not dissipated over the years; if anything, they have increased. Wigmore noted the "distrust of the expert witness, as one whose testimony is shaped by his bias for the party calling him." 2 John H.

Wigmore, *Evidence in Trials at Common Law* § 563, at 761 (Chadbourn rev.1979) (emphasis in original). In proposing Federal Rule of Evidence 706, which codified the authority of the court to appoint its own expert witness, the Advisory Committee commented that "[t]he practice of shopping for experts, the venality of some experts, and the reluctance of many experts to involve themselves in litigation, have been matters of deep concern." Professor Michael Graham, of the University of Illinois Law School, has observed:

> "The professional expert witness advocating the position of one side or the other has become a fact of life in the litigation process. Practicing lawyers can quickly and easily locate an expert witness to advocate nearly anything they desire. In each part of the country, if you need an expert medical witness to state that plaintiff suffered a whiplash injury, call expert X; if you need a medical expert to dispute that fact, call expert Y. The use of the expert witness has become so prevalent that certain expert witnesses now derive a significant portion of their total income from litigated matters."

> Michael H. Graham, *Impeaching the Professional Expert Witness by a Showing of Financial Interest*, 53 Ind. L. Jour. 35 (1977). Experts of all kinds regularly advertise their services to lawyers in the legal periodicals and newspapers. *See, for example*, any recent issue of the *American Bar Association Journal* or *Trial,* the *Journal of the Association of Trial Lawyers of America*.

*Wrobleski*, 353 Md. at 515-16, 727 A.2d at 932-33 (footnote omitted). Right or wrong, "it is widely believed that [expert witnesses] may be expected to express opinions that favor the party who engaged them and who pays their fees." ***Metropolitan Property & Cas. Ins. Co. v. Overstreet***, 103 S.W.3d 31, 43-44 (Ky. 2003). As the old saying goes, "Whose bread I eat, his song I sing."

Tennessee courts have recognized some similar concerns. *See, e.g.*, ***State v. Sparks***, 891 S.W.2d 607, 616 (Tenn. 1995) (quoting *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976)) ("'In this state, it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution. This applies to the expert opinions of medical men.'"); ***Crane Enamel Co. v. Jamison***, 217 S.W.2d 945, 949 (Tenn. 1948) ("it is settled law that the expert opinions of medical men are to be received with caution"); ***Bateman v. Ryder***, 64 S.W. 48, 49 (Tenn. 1901) (finding no error in the trial court's charge to the jury that "the testimony of experts . . . if paid for, should be received

with great caution and carefully weighed by the jury"); *Wilcox v. State*, 28 S.W. 312, 314 (Tenn. 1894) ("expert testimony is to be received with caution"); *see also* Douglas R. Richmond, *Expert Witness Conflicts & Compensation*, 67 Tenn. L. Rev. 909, 934 (2000) ("Trial lawyers and courts alike are concerned about testimony by 'professional experts.'")

There is no doubt that expert testimony can be "powerful evidence" and can have "a compelling effect with a jury." *Wrobleski*, 353 Md. at 517, 727 A.2d at 933. As a result, the fact-finder should "scrutinize" the testimony of experts, looking "to the circumstances that brought them in as witnesses; to the fact of compensation, and to what extent, if any, under all the circumstances, their credibility might be affected thereby." *Persons v. State*, 16 S.W. 726, 727 (Tenn. 1891).

"Lawyers and judges regard cross-examination as an essential safeguard of the accuracy and completeness of testimony." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). The purpose of cross-examination is "to adduce from a witness any information that may clarify, qualify, or undercut a witness's testimony on direct examination, impair its effectiveness, or affect the inferences the trier-of-fact might draw." *Id.* at 708-09 (citing Roberto Aron, et al, *Cross–Examination of Witnesses* § 2.06 (1989)). In recent years, "the difficulty and paramount importance of thorough, comprehensive cross-examination of experts have increased markedly." *Trower v. Jones*, 121 Ill.2d 211, 215, 520 N.E.2d 297, 299 (Ill. 1988). Expert "locator" services "can help the litigants of either side of most any case find an expert who will help advocate the desired position." *Id.* at 216, 520 N.E.2d at 299. In addition, "many experts today spend so much of their time testifying throughout the country that they might be deemed not only experts in their field but also experts in the art of being a persuasive witness and in the art of handling cross-examination." *Id.* Substantive cross-examination of a witness with extensive litigation experience is often very difficult, as the witness is likely to be "proficient in the art of expert witness advocacy" and "at ease with the material and capable of making fine line distinctions between the current situation and those raised in the questions of examining counsel." *Wrobleski*, 353 Md. at 518, 727 A.2d at 934 (citing Graham, 53 Ind. L. J. at 40-41). The jury may view "extensive or sharp questioning about the details as unnecessary quibbling." *Id.*

"Other than trotting out one's own experts, exposure of financial interest bias may sometimes be the most effective challenge that can be made to an expert's testimony[.]" *Wrobleski*, 353 Md. at 518, 727 A.2d at 934. "Exposure of potential bias based on self-interest is often attempted through cross-examination directed at how much the witness is being paid for his or her services in the case at bar, the frequency with which the witness testifies in similar kinds of cases, whether the witness customarily appears for a particular type of party (usually plaintiff or defendant), whether the witness is frequently employed by a particular party or attorney and, if so, how much income the witness derives from that

employment, and, as in this case, the amount or the percentage of the witness's total income that is derived from lawyer referrals or testimony in lawsuits." *Id.* at 517, 727 A.2d at 933-34. This type of financial discovery is aimed at exposing "the professional 'hired gun,' who earns a significant portion of his or her livelihood from testifying and . . . may have a general economic interest in producing favorable results for the employer of the moment." *Id.* at 517-18, 727 A.2d at 934. As one author put it,

> That an expert in a particular field may be in effect a 'professional witness' in lawsuits, rather than being more or less exclusively a practitioner whose employment in a lawsuit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality.

Russell G. Donaldson, Annotation, *Propriety of Cross-examining Expert Witness Regarding His Status as "Professional Witness,"* 39 A.L.R.4th 742, 746 (1985).

It is well-settled in Tennessee that "[a] finder of fact may consider an expert's bias or financial interest in the litigation when determining the weight to be given to his or her opinions." *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 547 (Tenn. Ct. App. 2005) (quoting *Street v. Levy, L.P.*, No. M2002-02170-COA-R3-CV, 2003 WL 21805302, at *4 n. 5 (Tenn. Ct. App. Aug. 7, 2003)). For example, "a finder of fact may consider the steady stream of referrals by a lawyer to a medical expert in determining how much weight should be given to the medical expert's testimony." *Street*, 2003 WL 21805302, at *4 n.5 (citing *Noel v. Jones*, 532 N.E.2d 1050, 1054 (Ill. App. Ct. 1988)). However, Tennessee appellate courts have not had occasion to consider the precise issue before us, namely, whether a trial court may require an expert to disclose the precise amount of his or her income earned from testifying generally.

Several courts in other jurisdictions have considered "the issue of whether a trial court may compel an expert witness to produce potentially relevant income-stream financial records at the request of an opposing party." *Falik v. Hornage*, 413 Md. 163, 183, 991 A.2d 1234, 1246 (2010). However, the courts that have considered the propriety of discovering such financial information from an expert witness, and cross-examining him or her about it, have reached a wide range of results. Some courts have refused to require expert witnesses to disclose the same type of information sought from Dr. Evans, while others have required expert witnesses to disclose much more income information than that requested in the present

case.[5]

One of the states that has somewhat restricted opposing parties' access to such information is Florida. The Supreme Court of Florida has set forth broad guidelines declaring that an expert may be asked to estimate the portion of his or her professional time or work devoted to service as an expert, but "[t]he expert need not answer how much money he or she earns as an expert or how much the expert's total annual income is." *Elkins v. Syken*, 672 So.2d 517, 521 (Fla. 1996).[6] The Supreme Court of Oregon has also ruled that an expert witness did not have to disclose the precise amount of his annual compensation during cross-examination. *State By and Through State Hwy. Comm'n v. Superbilt Mfg. Co.*, 204 Or. 393, 407, 281 P.2d 707, 713 (Or. 1955) (holding that it was proper to ask an appraiser how many times he had testified for the State and how much he was being paid in the particular case, but that it was error to allow questioning as to how much money he had received as an appraiser for the State in prior unrelated cases between 1946 and 1953).

Although some courts limit the amount of income information that can be discovered, the courts generally agree that an expert's income information is relevant to show potential bias. *See, e.g.*, *Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) ("[N]o intellectually honest argument can be made that the information sought by plaintiff regarding [the expert's] activities as a defense expert witness is not relevant to bias/prejudice impeachment, and

---

[5] According to Russell G. Donaldson, *Annotation, Propriety of Cross-examining Expert Witness Regarding His Status as "Professional Witness"*, 39 A.L.R.4th 742, 746 (1985):

Although some early cases appear to have taken a more or less categorical view as to the propriety of such questioning generally by stating that certain specific questions in areas devoted to the elicitation of an expert's "professional witness" status were simply not permissible, as with most issues concerning the propriety of cross-examination, the question whether to permit cross-examination devoted to eliciting such status is today regarded as a matter largely within the discretion of the trial court, and is limited largely by the degree to which the court finds the particular questions or line of questioning involved relevant. For this reason, cases dealing with the same subject matter in the same jurisdiction have often had opposite results with regard to matters actually permitted to be brought out upon such cross-examination, the initial decisions of the trial courts being generally upheld on appeal unless seen as involving matters of such importance as to constitute abuse of the very wide discretion of the trial judge in such matters.

We note that there are many federal district court cases addressing the issues before us, and those courts are divided on the issues as well, reaching a wide variety of conclusions. For that reason, we have generally limited our discussion in this case to the decisions of other State courts.

[6] However, the Florida Supreme Court ruled that the expert may be ordered to produce "business records, files, and 1099s . . . upon the most unusual or compelling circumstance." *Elkins*, 672 So.2d at 521.

-18-

therefore within the scope of discovery[.]”); ***Cooper v. Schoffstall***, 588 Pa. 505, 522, 905 A.2d 482, 494 (2006) (“[E]ven those jurisdictions that have substantially limited discovery of financial information from expert witnesses, generally recognize the relevance of the information[.]”). The courts that limit financial discovery from experts often do so because of privacy concerns and the potential chilling effect of such discovery on would-be experts. *See, e.g.*, ***American Family Mut. Ins. Co. v. Grant***, 222 Ariz. 507, 513, 217 P.3d 1212, 1218 n.8 (Ariz. Ct. App. 2009) (“experts will be reluctant to participate in the litigation process if they believe wholesale rummaging through their professional and financial affairs will ensue”); ***Elkins***, 672 So.2d at 522 (“[A]n overly burdensome, expensive discovery process will cause many qualified experts ... to refrain from participating in the process, particularly if they have the perception that the process could invade their personal privacy. To adopt petitioner's arguments could have a chilling effect on the ability to obtain doctors willing to testify[.]”).

Despite these concerns, a majority of the courts that have considered the issue have allowed expert witnesses to be questioned about the amount of income they earn from their forensic activities.[7] ***Wrobleski***, 353 Md. at 519, 727 A.2d at 935. *See, e.g.*, ***Collins v. Wayne Corp.***, 621 F.2d 777, 784 (5th Cir. (Tex.) 1980) (finding no error in questioning an expert as to how much he earned from testifying during 1974, stating, “cross-examination of an expert about fees earned in prior cases is not improper”); ***Trower***, 121 Ill.2d at 218, 520 N.E.2d at 300 (holding that it was permissible to inquire how much the expert witness was earning annually from services relating to rendering expert testimony); ***Simon v. Clark***, 660 N.E.2d 634, 636-37 (Ind. Ct. App. 1996) (holding that a trial court erred in refusing to allow questioning as to the amount of compensation that an expert witness received in the past year for performing evaluations for defense attorneys, but that such error was harmless in light of other evidence presented on bias); ***Jones v. Bordman***, 243 Kan. 444, 455, 759 P.2d 953, 962 (1988) (“It is proper to ask what percent of a physician's practice involves examining, diagnosing, and/or testifying for defendants, and what he is paid for such work[.]”); ***Metropolitan Property & Cas. Ins. Co. v. Overstreet***, 103 S.W.3d 31, 44 (Ky. 2003) (holding that an expert physician's annual income from court-ordered medical examinations is discoverable, as well as the percentage that such examinations constitute of the expert's general practice); ***Wrobleski***, 353 Md. at 526, 727 A.2d at 938 (allowing an inquiry “both

---

[7] Some jurisdictions “require litigants to first pursue less intrusive discovery before resorting to broad demands for information[.]” ***American Family Mut. Ins. Co. v. Grant***, 222 Ariz. 507, 513, 217 P.3d 1212, 1218 (Ariz. Ct. App. 2009); *see, e.g.*, ***Allen v. Superior Court of Contra Costa County***, 151 Cal.App.3d 447, 198 Cal.Rptr. 737, 741 (1984) (holding that the trial court abused its discretion when it required document production without a showing that a less intrusive method of discovery would not suffice); ***Primm v. Isaac***, 127 S.W.3d 630, 638 (Ky. 2004) (holding that “the least burdensome route of discovery was simply not followed” but that parties can seek leave of court to take additional discovery if they can demonstrate that additional information is necessary to undertake reasonable bias impeachment).

into the amount of income earned in the recent past from services as an expert witness and into the approximate portion of the witness's total income derived from such services"); *State ex rel. Lichtor v. Clark*, 845 S.W.2d 55, 65 (Mo. Ct. App. 1992) ("the trial judge in this case has discretion to allow testimony as to the amount of annual income derived from employment as an expert witness"); *Cooper v. Schoffstall*, 588 Pa. 505, 508-09, 905 A.2d 482, 485 (2006) (allowing discovery of an expert's "approximate amount of income each year, for up to the past three years, garnered from the performance of [litigation-related activities]").[8]

In explaining its decision to allow inquiry into how much an expert witness was earning annually from serving as an expert, the Illinois Supreme Court explained that "the financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case." *Trower*, 121 Ill.2d at 218, 520 N.E.2d at 300. "A favorable verdict may well help him establish a 'track record' which, to a professional witness, can be all-important in determining not only the frequency with which he is asked to testify but also the price which he can demand for such testimony." *Id.* The Supreme Court of Kentucky said, "It is undeniable that an expert's tendency to slant his testimony may be affected not just by how much he is being compensated on one particular occasion, but also by how much of his annual income is derived from similar testimony." *Metropolitan Property & Cas. Ins. Co.*, 103 S.W.3d at 44. The Court observed that a jury could reasonably believe that a physician who derives a substantial percentage of his annual

---

[8]  The Supreme Court of Pennsylvania, relying in part on *Wrobleski*, held that "the appropriate, threshold showing to establish cause for supplemental discovery related to potential favoritism of a non-party expert witness retained for trial preparation is of reasonable grounds to believe that the witness may have entered the professional witness category. In other words, the proponent of the discovery should demonstrate a significant pattern of compensation that would support a reasonable inference that the witness might color, shade, or slant his testimony in light of the substantial financial incentives." *Cooper*, 588 Pa. at 524-25, 905 A.2d at 494-95. However, in *Falik*, Maryland's highest court clarified its holding in *Wrobleski* and held that a party is not required to demonstrate that an expert is a "professional witness" before it can gain access to the expert's financial information. The Court described such as theory as "circuitous" and "circular in its expectation," stating:

Following Dr. Falik's theory, the party seeking discovery first must establish (by undefined criteria) that the witness is a "professional witness" before the party may be entitled to inquire into the witness's income stream. That is circuitous. If the answers that the party is seeking constitute the prima facie showing, it is unlikely that a party could ever establish that a witness is a "professional witness," without knowledge of the witness's prior income from expert services gained from sources other than through discovery in the immediate case. Thus, there is here no separate prima facie burden of proving that a proffered non-treating medical expert witness is a "professional witness."

413 Md. at 189, 991 A.2d at 1250.

-20-

income from litigation-related services, "potentially earning hundreds of thousands of dollars every year" from such work, "might be tempted to slant his testimony to suit his employer." *Id.* In contrast, a physician testifying for the first time, but earning the same fee, might face a lesser temptation. *Id.* Yet, the jury would be unable to distinguish that physician from the "professional witness" if courts flatly prohibit the discovery of an expert's annual income from litigation activity. *Id.* The Missouri Court of Appeals explained, "'Evidence that a witness makes substantial income from testifying does not necessarily imply that his fees are unreasonable, but such evidence does illuminate the financial interest the expert has in giving such testimony.'" *Lichtor*, 845 S.W.2d at 65 (quoting *Trower*, 121 Ill.2d at 219, 520 N.E.2d at 301). Showing "a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases." *Collins*, 621 F.2d at 784; *see also Cooper*, 588 Pa. at 526, 905 A.2d at 495 (noting that some courts do not allow discovery of an expert's annual income from litigation-related activities but holding that such information "is within the fair scope of relevance on the question of potential favoritism").

Although Tennessee courts have not directly considered the issue before us, there are several rules and principles embedded in Tennessee law that impact our analysis. First of all, Rule 616 of the Tennessee Rules of Evidence states that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Thus, evidence of bias or prejudice is admissible pursuant to Rule 616. *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 374 (Tenn. Ct. App. 2005). Some common examples of bias or prejudice include "a witness's personal stake in the outcome of the litigation, . . . a witness's relationship to a party in the lawsuit, [and] a witness's motives for testifying." *Hunter v. Ura*, 163 S.W.3d 686, 699 (Tenn. 2005) (citing Neil P. Cohen, et al., *Tennessee Law of Evidence* § 6.16[4] (4th ed. 2000)).

"Bias is an important ground for impeachment." **Tenn. R. Evid. 616, Adv. Comm'n Cmt.** (citing *Creeping Bear v. State*, 113 Tenn. 322, 87 S.W. 653 (1905)). "It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony." *Creeping Bear v. State*, 87 S.W. at 653. "The rule of admissibility of evidence to show bias or interest of a witness encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only." *Whittemore v. Classen*, 808 S.W.2d 447, 452 (Tenn. Ct. App. 1991) (citing *Majestic v. Louisville & N.R. Co.*, 147 F.2d 621 (6th Cir. 1945)). As we noted earlier, a finder of fact may consider an expert's bias or financial interest in the litigation when determining the weight to be given to the expert's opinions. *GSB Contractors, Inc.*, 179 S.W.3d at 547

(citing *Street*, 2003 WL 21805302, at \*4). The fact-finder should "scrutinize" the testimony of experts, looking "to the circumstances that brought them in as witnesses; to the fact of compensation, and to what extent, if any, under all the circumstances, their credibility might be affected thereby." ***Persons v. State***, 16 S.W. 726, 727 (Tenn. 1891).

Tennessee Rule of Evidence 611(b) is also relevant to our analysis, as it provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" This Rule allows for the "wide-open scope of cross-examination historically favored in Tennessee." **Tenn. R. Evid. 611, Adv. Comm'n Cmt.** "It is well established that wide latitude should be afforded on cross-examination." ***Steele v. Ft. Sanders Anesthesia Group, P.C.***, 897 S.W.2d 270, 278 (Tenn. Ct. App. 1994). "Furthermore, a witness may be cross-examined to show possible prejudice or bias, and this right should be limited only upon a showing of the most extraordinary circumstances." ***Id.*** (citing *Phillips v. Pitts*, 602 S.W.2d 246, 249 (Tenn. Ct. App. 1980)).

It is equally well settled that the "propriety, scope, manner, and control" of cross-examination of witnesses is within the discretion of the trial court and will not be interfered with in the absence of an abuse of discretion. ***State v. Echols***, 382 S.W.3d 266, 285 (Tenn. 2012). Determining the propriety of questions on cross-examination is "very largely" left to the "wide discretion" of the trial court. ***Woods v. Herman Walldorf & Co., Inc.***, 26 S.W.3d 868, 877 (Tenn. Ct. App. 1999).

Considering all these principles, and having reviewed caselaw from around the country discussing the pertinent issues, we cannot say that the trial judge abused her discretion in concluding that Dr. Evans' annual income from serving as an expert witness was both "relevant and certainly discoverable," as well as an appropriate subject for cross-examination by defense counsel. "The fact that these decisions are characterized as discretionary reflects a recognition that they involve a choice among acceptable alternatives." ***Overstreet***, 4 S.W.3d at 708. "Thus, the appellate courts will set aside a trial court's discretionary decision only when the decision is based on a misapplication of the controlling legal principles or on a clearly erroneous assessment of the evidence." ***Id.*** The trial judge in this case attempted to fashion a reasonable remedy and "compromise" between the parties based upon relevant and appropriate considerations. She clearly took into account the applicable law, as her remarks during the numerous hearings indicate that she was familiar with caselaw from other jurisdictions pertaining to this subject. A review of the record indicates that the trial judge exercised her discretion in a manner that was guided by the applicable legal principles, and we cannot say that she reached an illogical result or relied on reasoning that caused an injustice.

Again, the discovery dispute began with defense counsel requesting Dr. Evans' schedule of charges for work as an expert witness in a lawsuit, all income he received from reviewing cases, consulting or testifying in connection with lawsuits during the past ten years, and 1099s and related documents reflecting his income for medical/legal review for the years 2000 to 2010. Dr. Evans did not produce these documents, and at his deposition, he either could not or would not answer questions from defense counsel regarding his income. When asked how much income he earns annually from serving as an expert witness, he said he did not know, and when asked to give an estimate for the last three years, he said he could not do so. He estimated that fifteen to twenty percent of his income comes from expert activity but claimed he did not know "the actual amount of dollars." Dr. Evans has been testifying as an expert witness for thirty years, he has served as an expert witness for the attorneys representing plaintiff in this case for over fifteen years, he has reviewed twelve to twenty cases per year for the past twenty years, and he "would guess" that he presently has between ten and fifty open files, although it could be more than fifty.[9] Dr. Evans had been disclosed as an expert witness in 179 cases in 23 different states, and in 96% of those cases, he had testified for plaintiffs. At one of the first hearings in this matter, the trial judge said that Dr. Evans' history "sort of has a red flag that says professional expert to me," and his testimony raised doubts in her mind about whether he really only earned fifteen to twenty percent of his income from testifying. Nevertheless, the trial judge denied Defendant's first motion to compel production of documents because the documents were not in Plaintiff's possession. She ruled that Defendant's request for ten years of income information was too broad and limited the request to five years. She also suggested that, rather than producing tax returns, Dr. Evans should be allowed to produce an affidavit from his accountant stating his precise income figures, in order to avoid the disclosure of irrelevant private information. On June 12, 2012, the court entered an order requiring Plaintiff's counsel to produce, within two weeks, an affidavit from Dr. Evans' accountant setting forth his income from testifying or participating in lawsuits for the past five years, in addition to his total gross income from the treatment and care of patients during those years. The judge refused to require Dr. Evans to produce his 1099s. She allowed the affidavit to be provided directly to defense counsel so that it would not be maintained in the court file. The trial judge made it clear that her ruling would be applicable to the experts serving for both parties, in the event that Plaintiff's counsel chose to pursue income information from Defendant's expert witnesses. The order stated that the information contained in the affidavit "shall be used solely for the purpose of verifying or impeaching the expert's testimony within the context of this litigation and may

_____

[9] Dr. Evans was asked during his deposition how many "open" or current files he presently maintained, and he responded, "I have no way to know." Defense counsel asked if it was more than ten, and Dr. Evans responded, "Yes." Defense counsel then asked if it was more than fifty, and Dr. Evans said, " I don't know." Defense counsel said, "Okay. You think it's probably between 10 and 50?" and Dr. Evans replied, "I would guess, yes, but I don't really know."

be used at trial only if permitted to do so by subsequent order of the Court." Despite the court order, Plaintiff did not file the affidavit from Dr. Evans' accountant. Defendant filed a motion for sanctions, but the trial judge generously extended the deadline for production of the affidavit until July 12, and she ruled that Dr. Evans could send the affidavit directly to her personal email address, for her in camera review, rather than giving it to defense counsel. She would then review the information in order to determine whether it confirmed or contradicted Dr. Evans' deposition testimony. If it proved that his testimony was accurate, she would not disclose the information to defense counsel. She also said she would not disclose the information to defense counsel if Dr. Evans elected to withdraw from the case. However, in response to Defendant's motion in limine, the trial judge ruled that defense counsel would be permitted to ask Dr. Evans, during cross-examination at trial, about his annual income from testifying over the past one or two years. The extended deadline expired with no attempt at compliance by Plaintiff or Dr. Evans. Defendant then filed a second motion for sanctions. Although the trial judge initially ruled that Dr. Evans would be excluded as an expert, she set aside that order upon Plaintiff's motion to amend, as he claimed that the previous order incorporating the trial court's oral ruling was "confusing" to Dr. Evans. The court then allowed Plaintiff to produce the affidavit to her by December 15, 2012. On December 14, Dr. Evans emailed the affidavit to the trial judge, but he imposed the two "notices" instructing the trial judge not to open the attachment if his refusal to answer questions at trial about his income was going to disqualify him. Defendant filed a third motion for sanctions, which the trial court denied "at this time," as she granted Plaintiff permission to seek an interlocutory appeal. When the application was denied by this Court, Defendant renewed his motion for sanctions. Finally, on July 2, 2013, over a year after the court originally ordered Dr. Evans to produce the affidavit containing his income figures, the trial court entered an order excluding Dr. Evans as a witness in this case and requiring Plaintiff to identify a replacement expert within sixty days. After Plaintiff failed to obtain a replacement expert, and declined the trial judge's suggestion of a nonsuit, the trial court entered an order of dismissal on September 4, 2013, noting that Plaintiff had not identified a replacement expert.

We have summarized the tortured procedural history of this case only to demonstrate that the trial judge attempted, on multiple occasions, to accommodate Dr. Evans' privacy concerns but yet provide Defendant with information that was necessary, in the trial court's opinion, to explore Dr. Evans' potential financial bias. An affidavit stating Dr. Evans' income from the past five years from testifying or participating in lawsuits and his total gross income from the treatment and care of patients was, in our opinion, reasonably tailored and minimally intrusive, considering the particular facts of this case. The affidavit was a useful tool for confirming the accuracy of Dr. Evans' deposition testimony about his professional income, and less invasive and burdensome than producing complete tax returns. In addition, the trial judge went so far as to say that the affidavit could be provided directly to her for in

camera review, not to defense counsel. Even though the affidavit would presumably have to be prepared by Dr. Evans' accountant specifically for this purpose, the cost of its preparation was to be paid by Defendant, and there was no attempt by Dr. Evans to show that compiling the income information would be burdensome. The information that the trial judge ordered produced was not duplicative, as Dr. Evans had already been asked to state his annual income from testifying during his deposition, and he was unable to do so or even to give a reasonable estimate.

It was not unreasonable, under the facts of this case, to require the production of documentary evidence confirming Dr. Evans' previous estimate of his annual income. Keeping in mind that the purpose of this type of discovery is to detect bias, the Missouri Court of Appeals, affirming an order requiring document production in *Lichtor*, noted that "a venal expert witness could not be expected to fully answer inquiries as to which the witness is not required to produce documentation," and some invasion of the expert's privacy may be "necessary to insure the honesty and accountability of the expert." 845 S.W.2d at 65. "A delicate balancing of privacy interests against the need for accountability therefore becomes the responsibility of the trial court." *Id.* Similarly, in *Falik*, Maryland's highest court considered an argument to the effect that "only verbal inquiries" should be authorized, without "the compellable production of documents that support the verbal answers to the permitted verbal inquiries." 413 Md. at 187-88, 991 A.2d at 1249. The Court rejected that argument, stating:

> The production of limited financial documents, from a contemporary and finite period of time, that reflect payments made to the witness in connection with medical-legal services is permitted because, if the inquiring party does not have access to such records, yet is permitted to inquire orally into the witness's income stream, the inquiring party will not be able to cross-examine effectively the expert witness. Civil trial practice in this area is not dependent on articles of faith; rather, corroboration is important.

*Id.* "If an inquiring party's counsel is not allowed to view the records that purportedly support the expert's answers to the permitted questions, then it must accept the expert's answer without the opportunity to verify. We do not require blind trust without verification." *Id.* Finally, in *Rowe v. State Farm Mut. Auto. Ins. Co.*, 670 So.2d 718, 726 (La. Ct. App. 1996), the Louisiana Court of Appeals found that a trial court's decision to deny a subpoena for a physician's income records rendered the plaintiffs "unable to prepare for or offer any meaningful cross-examination" to prove bias. The plaintiffs' inability to obtain and review the documentary evidence prior to trial "had the effect of limiting plaintiffs to no weapon save cross-examination which, uncomplemented by other discovery methods, seldom is of adequate value when thrust against the broadside of the litigation expert who can so

gracefully stiff-arm his unprepared cross-examiner." ***Id.***

The trial court's orders reflect an attempt to balance the relevant privacy interests "against the need for accountability." ***Lichtor***, 845 S.W.2d at 65. The court did not allow unbridled access or "wholesale rummaging" through Dr. Evans' personal records, and we find no reversible error in its handling of this issue.

We also find that the trial court did not abuse its discretion in ruling that defense counsel would be permitted to ask Dr. Evans at trial about "the dollar amount of his expert witness income for a prior year, such as the year 2010, among others." Wide latitude is afforded on cross-examination in Tennessee; "a witness may be cross-examined to show possible prejudice or bias, and this right should be limited only upon a showing of the most extraordinary circumstances." ***Steele***, 897 S.W.2d at 278. Plaintiff has again failed to show that the trial judge misapplied controlling legal principles or based her decision on a clearly erroneous assessment of the evidence.

Plaintiff argues that the 2011 amendment to Tennessee Rule of Civil Procedure 26.02(4)(A)(i) "implicitly precludes discovery of the dollar amount of an expert's annual forensic income" and also precludes cross-examination regarding an expert's annual income. Rule 26.02 provides, in pertinent part:

> Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> (1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.
> . . .
> (4) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
> (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. *In addition, upon request in an interrogatory, for each person so identified, the party shall*

*disclose the witness's qualifications (including a list of all publications authored in the previous ten years), a list of all other cases in which, during the previous four years, the witness testified as an expert, and a statement of the compensation to be paid for the study and testimony in the case.*

The italicized portion of the Rule was added in 2011. Because the last sentence requires disclosure of the compensation "to be paid . . . in the case," Plaintiff argues that "the amount of [an expert's] compensation can only be discovered regarding the particular case at issue." Plaintiff claims that it is clear from the 2011 amendment that the Supreme Court "contemplated the issue before this Court" and concluded that "a party does not have the right to inquire about the actual amount of an expert's *annual* forensic income." (Emphasis added).

We do not agree with Plaintiff's suggestion that the last sentence of Rule 26.02(4)(A)(i) imposes a ceiling on the amount of information that can be discovered about an expert witness. The Advisory Commission Comment to the 2011 amendment states, "The sentence added to Rule 26.02(4)(A)(i) concerning discovery of information about those intended to be called as expert witnesses at trial is designed to minimize the cost of learning additional information about an opposing party's expert witnesses." The federal counterpart to Rule 26 is similar. It sets forth required disclosures regarding expert testimony in Federal Rule of Civil Procedure 26(a)(2) and requires a report containing:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii) the facts or data considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

This requirement was added to the federal rule in 1993. The Advisory Committee Note explains that a "major purpose" of the amendment was "to accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information[.]" It describes the information covered by the Rule as "certain basic information that is needed in most cases to prepare for trial or make an informed decision about settlement." The Advisory Committee Note expressly provides that parties are *not* precluded "from using traditional discovery methods to obtain further information regarding these

matters, as for example asking an expert during a deposition about testimony given in other litigation beyond the four-year period specified in Rule 26(a)(2)(B)." Thus, federal courts have held that "requests for documents are not objectionable merely because they seek documents outside the scope of the expert disclosures required by Rule 26(a)(2)(B)." ***Moses v. Halstead***, 236 F.R.D. 667, 676-77 (D. Kan. 2006). In other words, it is not enough to object to a discovery request on the mere basis that it "asks for . . . expert witness discovery beyond the scope of [federal] Rule 26." ***Id.***; *see also **Silgan Containers v. National Union Fire Ins.***, No. C 09–05971 RS (LB), 2011 WL 1058861, at *7 (N.D. Cal. Mar. 23, 2011) ("Though Rule 26 only requires [a party] to produce information corresponding to cases in which [an expert] testified at trial or by deposition in the past four years, it does not foreclose additional discovery if the information sought is relevant and discoverable.")

We likewise conclude that the last sentence of Tennessee Rule of Civil Procedure 26.02(4)(A)(i) was intended to clarify that certain information about an expert must be provided if requested by an interrogatory, in order to "minimize the cost of learning additional information." **Tenn. R. Civ. P. 26.02, Adv. Comm'n Cmt to 2011 Amendment.** However, it was not intended to establish an outer limit for what can be discovered about an expert. There is no indication on the face of the rule to suggest that a party is absolutely prohibited from seeking additional information about an opponent's expert witnesses, and we decline to interpret the rule in such a manner. We therefore reject Plaintiff's argument that Rule 26.02(4)(A)(i) prohibited the discovery of information about Dr. Evans' annual income from testifying as an expert.

Plaintiff also generally argues that the trial court's orders requiring disclosure of Dr. Evans' annual income from litigation-related activities permitted an unwarranted invasion of his privacy because he is simply a "seasoned" expert. However, inquiring into Dr. Evans' income was not unwarranted under the facts of this case. "The bias of seasoned expert witnesses may be difficult to detect." Richmond, 67 Tenn. L. Rev. at 941. We do not mean to say that Dr. Evans is in fact biased or a venal witness. "[T]he fact that an expert devotes a significant amount of time to forensic activities or earns a significant portion of income from these activities does not mean that the testimony given by the witness is not honest, accurate, and credible. It is simply a factor that is proper for the trier of fact to know about and consider." ***Falik***, 413 Md. at 180-81, 991 A.2d at 1245 (quoting *Wrobleski*, 353 Md. at 526, 727 A.2d at 938). "'[A]bility and dedication cannot insulate anyone from the suggestions of bias that a cross-examiner brings out when he plays his role in a trial.'" ***Cooper***, 588 Pa. at 523, 905 A.2d at 494 n.13 (quoting *Collins*, 621 F.2d at 784 n.5).

We wish to emphasize that our holdings on these issues are limited to the facts before us, and we do not find it necessary or appropriate to establish broad guidelines regarding what financial information will be discoverable or an appropriate issue for cross-examination

in every case. "Defining a bright-line standard for all cases is not practical." **Grant**, 222 Ariz. at 514, 217 P.3d at 1219. We express no opinion regarding the discoverability of the documents that were originally sought in this case, under these or other circumstances. In addition, our holding today should not be read to suggest that trial judges must make repeated concessions to comply with the wishes of expert witnesses or attempt to convince them to stay on a case. In our opinion, the trial judge in this case exercised the patience of Job with Dr. Evans and "bent over backwards" to accommodate his demands. He was given "multiple bites at the apple," as Defendant put it. Considering our standard of review on appeal, we simply hold that the trial judge did not abuse her discretion in handling these matters.

This brings us to Plaintiff's next issue, in which she argues that the trial judge abused her discretion in granting Defendant's motion to exclude Dr. Evans as a witness. We find no abuse of the trial court's discretion on this issue. Tennessee trial courts "possess broad discretionary authority to control their dockets and the proceedings in their courts[.]" **Barnett v. Tennessee Orthopaedic Alliance**, 391 S.W.3d 74, 79 (Tenn. Ct. App. 2012) (citing *Hessmer*, 138 S.W.3d at 904). Tennessee Rule of Civil Procedure 37.02 provides that if a deponent or party "fails to obey an order to provide or permit discovery," the trial court "may make such orders in regard to the failure as are just," including an order "prohibiting that party from introducing designated matters in evidence[.]" This also includes an order precluding an expert from testifying. *See* **Walls v. Conner**, No. E2007-01917-COA-R3-CV, 2008 WL 4735311, at *5 (Tenn. Ct. App. 2008). "Even without the imprimatur of Rule 37, however, the Supreme Court has ruled that 'the inherent power of trial judges permits the trial judge to take appropriate corrective action against a party for discovery abuse.'" **Id.** (quoting *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988)). "Thus, the authority to impose sanctions for abuse of the discovery process derives from the Rules and the court's inherent powers." **Id.** (citing *State ex rel. Gibbons v. Smart*, No. W2007-01768-COA-R3-CV, 2008 WL 4491729, at *10 (Tenn. Ct. App. W.S. Oct. 8, 2008)). A trial court's sanction will not be disturbed absent an abuse of discretion. **Id.**

Here, Plaintiff and Dr. Evans repeatedly and knowingly failed to comply with the trial court's orders, despite multiple opportunities and generous extensions of deadlines. There comes a time when, as the saying goes, "enough is enough." Although Dr. Evans finally emailed the affidavit to the trial judge, he attempted to impose his own "notices" to the trial court regarding its use and confirmed that he would not answer the questions at trial that the trial judge had already ruled that defense counsel could ask. The trial judge did not abuse her discretion in excluding Dr. Evans as a witness.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed. Costs of this appeal are taxed to the appellant, Linda Laseter, individually and on behalf of her deceased mother, Alice H. Corr, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.