# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 4, 2016 Session

## ELIZABETH A. POPICK v. VANDERBILT UNIVERSITY

**Appeal from the Circuit Court for Davidson County**
**No. 09C1329          Thomas W. Brothers, Judge**

_____

**No. M2015-01271-COA-R3-CV**
**Filed March 13, 2017**

_____

The plaintiff filed this health care liability action against the defendant hospital after the death of her husband, alleging that his death was the result of negligent medical treatment. The jury returned a verdict in favor of the defendant. On appeal, the plaintiff argues that the trial court committed reversible error in: (1) excluding certain email messages as hearsay; (2) overruling her objections to defense counsel's cross-examination of a witness; (3) failing to instruct the jury to ignore statements made by defense counsel in closing argument; (4) refusing a request for a special jury instruction; and (5) declining to change the special verdict form. Discerning no reversible error, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY J. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Jon E. Jones and Patrick Shea Callahan, Cookeville, Tennessee, for the appellant, Elizabeth A. Popick.

Steven E. Anderson and Sara F. Reynolds, Nashville, Tennessee, for the appellee, Vanderbilt University.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On January 17, 2008, Mr. Joshua Popick fell over twenty feet while working on a roof. Mr. Popick suffered critical injuries, including multiple broken bones, a bruised

kidney, a lung contusion, and extensive internal bleeding. His injuries necessitated a month-long stay in the trauma intensive care unit at Vanderbilt University Medical Center ("Vanderbilt"). Vanderbilt discharged Mr. Popick to a rehabilitation facility in mid-February 2008, but he returned to Vanderbilt several times over the ensuing months for additional treatment. After his death on June 18, 2008, his wife, as his widow and the administrator of his estate, filed this health care liability action against Vanderbilt, alleging Mr. Popick's doctors were negligent in treating his injuries and that such negligence caused his death.

Upon admission to Vanderbilt, Mr. Popick was immediately intubated[1] and placed on a ventilator because he was in respiratory distress. Due to the severity of Mr. Popick's chest and lung injuries, he received high pressure ventilation to ensure he received an adequate amount of oxygen. His physicians knew that Mr. Popick needed multiple surgeries and long-term respiratory support. Because extended time on a ventilator entailed a high risk of serious complications, his physicians decided that Mr. Popick would benefit from a tracheostomy.[2] Once the physicians were able to safely lower Mr. Popick's ventilator pressure, he was scheduled for a tracheostomy.

Seven days after admission, Dr. Chad Johnson, a surgical resident, and Dr. Nathan Mowery, his supervising physician, prepared Mr. Popick for a percutaneous tracheostomy, a bedside procedure. However, after encountering difficulties in performing the procedure, Dr. Mowery decided that it would be safer to transfer Mr. Popick to an operating room. Dr. Mowery performed a successful open tracheostomy approximately fifteen minutes later.

Mr. Popick's tracheostomy tube was removed after his discharge from Vanderbilt. Although he initially reported no breathing difficulties, on March 30, 2008, Mr. Popick was re-admitted to Vanderbilt after experiencing increasing shortness of breath. A CT scan of Mr. Popick's neck performed on March 30 showed that part of his airway had narrowed. Dr. Brian Burkey, an otolaryngologist, diagnosed him with subglottic stenosis, a narrowing of the airway below the vocal cords.

To stabilize the airway, Dr. Burkey performed another open tracheostomy on April 3, 2008. During the procedure, Dr. Burkey noted a near total narrowing of the

---

[1] An endotracheal tube was inserted through Mr. Popick's mouth into his airway and attached to a machine that would breathe for him.

[2] During a tracheostomy, a shorter tube is inserted directly into a patient's airway through an incision in the trachea. According to the testimony, a tracheostomy is the preferred method of providing long-term respiratory care because a tracheostomy tube is more comfortable for the patient, has fewer risks, and allows more mobility.

subglottic tracheal region. The narrowing began directly below the cricoid cartilage[3] and extended downward approximately two centimeters. Dr. Burkey also found extensive cartilage growth, which needed to be removed in a subsequent surgery.

On April 18, 2008, Dr. Burkey operated again and this time removed the damaged section of Mr. Popick's trachea, including the additional cartilage. Dr. Burkey noted that Mr. Popick had developed dense scar tissue from both the April 3 tracheostomy and his original tracheostomy in January. On April 22, Mr. Popick returned to the operating room for Dr. Burkey to repair an air leak that had developed where Dr. Burkey had reattached his healthy tracheal tissue.

Subsequently, Mr. Popick continued to experience breathing difficulties caused by the development of granulation tissue[4] in the area of the reattachment. Dr. Burkey removed accumulated granulation tissue that was partially blocking Mr. Popick's airway on both May 21 and June 3 and, on June 3, also applied medication to the area in an attempt to prevent regrowth.

On June 16, 2008, Mr. Popick had a routine appointment with Dr. Burkey to evaluate his condition. After an examination, Dr. Burkey recommended another surgery to remove the accumulated granulation tissue. Surgery was scheduled for June 19, but sadly, the day before, Mr. Popick collapsed at home while eating breakfast and died.

On April 21, 2009, Mrs. Popick filed this health care liability action against Vanderbilt in the Circuit Court for Davidson County, Tennessee. Her complaint alleged that Mr. Popick's doctors deviated from the standard of care in the placement and management of his January tracheostomy and by failing to admit him to the hospital on June 16 to monitor his condition until the scheduled surgery on June 19. After an extended period of discovery, the case was tried before a jury from February 23 to March 3, 2015.

A. PROOF AT TRIAL

1. The January 23 Tracheostomy

Mrs. Popick claimed that, during the aborted bedside tracheostomy attempt, her husband's doctors negligently fractured his cricoid cartilage, which caused the narrowing of his airway. The procedure note in Mr. Popick's medical records erroneously described

---

[3] The cricoid cartilage is a rigid, ring-shaped structure at the top of the trachea that supports the voice box. *Cartilage, Cricoid*, Taber's Cyclopedic Medical Dictionary (21st ed. 2005).

[4] Granulation tissue is part of the body's healing process and is the precursor to scar tissue. *Tissue, Granulation*, Taber's Cyclopedic Medical Dictionary (21st ed. 2005).

an uncomplicated, completed percutanous tracheostomy. According to the note, after Mr. Popick was sedated, the physician made an incision over the trachea and bluntly dissected through the underlying tissue to the midline of the pre-tracheal space. "Using a [sic] Open technique technique [sic]," the physician made a small hole in the trachea into which he placed a guide wire and a series of dilators which he used to expand the hole to the necessary size. Then, a "#9 Shiley un-fenestrated cuffed [e]xtra long tracheostomy tube was inserted." The guide wire and dilator were replaced with the inner cannula, and the tracheostomy tube was connected to the ventilator. As a final step, the physician confirmed that the tracheostomy was properly placed and functioning.

At trial, Vanderbilt maintained that the procedure note was inaccurate[5] and did not describe what actually occurred during the bedside attempt. Dr. Nathan Mowery testified that, during the bedside attempt, the surgical resident made a longitudinal incision over the trachea and, using a blunt instrument, pushed the underlying tissue aside until he could see the tracheal space. At that point, the resident attempted to find the physical landmarks that guide the proper placement of the tracheostomy tube. Because the resident could not find the landmarks, Dr. Mowery decided to transfer Mr. Popick to the operating room where he could better visualize the trachea before proceeding. According to Dr. Mowery, no needle, guide wire, dilators, or tube was inserted into Mr. Popick's trachea at his bedside.

Dr. Chad Johnson, the surgical resident involved in Mr. Popick's bedside tracheostomy, created the procedure note. He testified that, although he had no independent memory of the procedure or creating the note, he was familiar with the process and could explain how the incorrect note probably occurred. He explained that the note was a byproduct of Vanderbilt's electronic medical record system. The system in use at that time contained templates for physicians to use when documenting procedures. For any given procedure, the resident chose the appropriate template and selected answers to the questions from the drop down menu. The system then "auto-populated" the note with prearranged wording.

According to Dr. Johnson, residents commonly started a procedure note before actually beginning the procedure. For example, before starting the bedside tracheostomy, he would have selected the template and checked the appropriate boxes for the diagnosis, the consent form, the pre-sedation evaluation, the site preparation, the necessary medications, the location of the planned incision, and the procedure technique.

---

[5] In addition to erroneously describing the procedure as successfully completed, the note incorrectly named Dr. Heather MacNew as a participant in the bedside attempt. Dr. MacNew testified that she only assisted in the open tracheostomy. The note also indicated a "#9 Shiley" tracheostomy tube was used when, in reality, Mr. Popick received a smaller tube.

4

In 2008, Vanderbilt physicians used the "modified Seldinger technique" for bedside tracheostomies. In the operating room, physicians used an "open" technique. In Mr. Popick's case, Dr. Johnson explained that, before the procedure was performed, he would have chosen "modified Seldinger" as the technique. When he made that selection, the system automatically entered all the steps of the technique in the description section of the note. He would have finished the procedure note after Mr. Popick received his tracheostomy in the operating room. At that time, he assumed he chose "other" for the technique and typed in "open technique." The electronic system then incorporated "open technique" into the previously prepared description of the modified Seldinger technique.

Dr. Johnson admitted that he did not remove the incorrect language before he attested to the accuracy of the note. In his opinion, the description contained in the procedure note became less important after Mr. Popick was transferred to the operating room because the note's function changed from a procedure note to a brief operative note. According to Dr. Johnson, a brief operative note served as a placeholder in the medical record alerting physicians that Mr. Popick was receiving a tracheostomy; the details of the procedure both at the bedside and in the operating room were contained in Dr. Mowery's operative report.

After Dr. Mowery completed Mr. Popick's tracheostomy procedure in the operating room, he dictated a detailed operative report for the medical record. In the report, Dr. Mowery described the relevant physical findings. Mr. Popick "already had a previous longitudinal incision that had been made just moments before on the floor" in an attempt to perform the bedside tracheostomy. Mr. Popick's neck was "extremely short but thick" and "pushed the trachea approximately 4 cm below the skin level." Mr. Popick's thyroid isthmus was also unusually high and obscured the tracheal rings. Therefore, "[g]iven the thyroid location, a tracheostomy in the second ring space was not possible without" surgically moving the thyroid isthmus.

Dr. Mowery tied the isthmus out of the way and then placed "a tracheal hook in the cricoid cartilage to pull it proximally" to further increase visibility. Using the open technique, Dr. Mowery successfully placed the tracheostomy in the second inner tracheal space. Dr. Mowery testified that his operative report accurately described what occurred at the bedside and in the operating room. Dr. Mowery further opined that he and his staff complied with the standard of care in the placement of Mr. Popick's tracheostomy.

2. Causation Testimony

Plaintiff's expert witnesses testified that the standard of care for a non-emergency tracheostomy, like Mr. Popick's, is to place the guide wire, dilators and tracheostomy tube between the second and third tracheal rings. If the instruments or the tube are inserted too high in the trachea, the cricoid cartilage, which is located at the top of the trachea, can fracture and cause narrowing of the airway.

Although Mr. Popick was admitted to Vanderbilt with a normal airway, as evidenced by a January CT scan, a subsequent CT scan in March revealed narrowing directly below the cricoid cartilage. Plaintiff's experts opined that it was more likely than not that during the bedside procedure, the physicians attempted to place the dilators too high in the trachea and fractured the cricoid cartilage.

Dr. Franz Wippold, a neuroradiologist, testified that the March 30 CT scan showed an obvious break in the front portion of Mr. Popick's cricoid cartilage and the formation of a bone callus, or calcium, in the same area. According to Dr. Wippold, the CT scan also revealed new soft tissue growth that was most likely related to the fracture. He explained that the presence of bone callus and new soft tissue meant that the fracture was probably several weeks old and the body had begun the healing process. Dr. Wippold reviewed portions of Mr. Popick's medical records and determined that the only traumatic event that could explain his fracture was the tracheostomy.

Dr. Wippold admitted, under cross-examination, that the stenosis and extra cartilage seen in Mr. Popick were recognized risks of a tracheostomy. But Dr. Wippold also testified that a fractured cricoid cartilage was not a recognized risk of intubation or a tracheostomy.

Dr. Paul Spring, an otolaryngologist, agreed that the March CT scan showed a fractured cricoid cartilage. He explained that the process of trying to heal the fracture caused the narrowing of Mr. Popick's airway. The healing process resulted in soft tissue growth that blocked almost 25 to 30 percent of the airway. According to Dr. Spring, the only explanation in the medical record for the fracture was negligent placement of the tracheostomy tube during the aborted bedside procedure.

Dr. James Reibel, also an otolaryngologist, conceded that stenosis was a recognized complication of a non-negligent tracheostomy but opined that Mr. Popick's stenosis resulted from Vanderbilt's negligence based on the evidence of a fractured cricoid cartilage. In his medical opinion, the only explanation for Mr. Popick's fracture was that the doctors attempting the bedside tracheostomy inserted their instruments too high in the trachea.

Dr. John Ross, the Vanderbilt neuroradiologist who originally reviewed the March CT scan, testified that the CT scan did not indicate a fracture. In his opinion, the white spot that appeared on the March CT scan on or near the anterior portion of the cricoid cartilage represented calcification caused by the patient's medical care. Dr. Ross explained that cutting into the airway and inserting a tube is considered trauma or injury to the trachea. The body's natural reaction to such an injury was inflammation and calcification. When asked to specify an exact cause of the calcification, Dr. Ross

6

provided a list of possibilities, all under the umbrella of the medical care Mr. Popick received at Vanderbilt.

Vanderbilt's expert witness, Dr. Harold Pillsbury, testified that Mr. Popick's stenosis was caused by his necessary respiratory care. Dr. Pillsbury explained that when a patient is on high pressure ventilation, the cuff at the end of the endotracheal tube rubs against the lining of the airway and over time some of that protective lining disappears. The movement of the cuff at the end of a tracheostomy tube engenders a similar phenomenon. Once Mr. Popick's airway was inflamed from the tubes, his body attempted to heal itself, and the resulting accumulation of scar tissue caused the narrowing.

Dr. Pillsbury agreed that surgery on the airway is always traumatic, even without negligence. In his opinion, although the white spot on the CT scan probably resulted from the tracheostomy, the spot did not evidence a fracture or negligence.

Another Vanderbilt expert witness, Dr. Jeffrey Bumpous, opined that the cause of Mr. Popick's stenosis was his time on the ventilator coupled with his tracheostomy. According to Dr. Bumpous, stenosis is a recognized risk of both procedures. He testified that both the endotracheal and the tracheostomy tubes naturally moved and caused abrasion of the lining of the trachea, which led to the body generating scar tissue. In his opinion, Mr. Popick showed signs of having an extremely active inflammatory response.

Dr. Bumpous did not believe that Mr. Popick's cricoid cartilage had been fractured. In his experience, cricoid cartilage tended to break in two places, and the fractures were generally caused by a "high-velocity type of trauma." He found it significant that Dr. Mowery was able to lift the cricoid with a hook during the open tracheostomy. According to Dr. Bumpous, Dr. Mowery would have been unable to use the hook successfully if the cricoid were fractured. While Dr. Bumpous acknowledged that a fractured cricoid cartilage could cause stenosis like that seen in Mr. Popick, he maintained that any normal tracheostomy could cause the same result.

One of Mr. Popick's treating physicians, Dr. Brian Burkey, gave similar testimony about the causes of tracheal stenosis. Dr. Burkey explained that the number one cause of stenosis is trauma from the endotracheal tube. In his opinion, Mr. Popick's stenosis resulted from his necessary respiratory care, not negligent placement of a tracheostomy. According to Dr. Burkey, all tracheostomies involved trauma to the trachea.

Dr. Burkey testified that, when he removed the damaged portion of Mr. Popick's trachea, he removed the area shown as a white spot on the CT scan. He did not see an obvious fracture in the excised material, but he did not analyze the material closely.

Dr. Burkey did not know what the white spot represented. He hypothesized that it could be cartilage or inflammatory debris. He agreed, however, that the white spot was an abnormality that was not present when Mr. Popick was admitted to Vanderbilt. In his opinion, the white spot was "part of the healing process" from Mr. Popick's respiratory care. He opined that the same healing process probably caused the scar tissue inside Mr. Popick's airway and the extra cartilage adjacent to the cricoid cartilage.

## B. FINAL JUDGMENT

At the conclusion of the proof, Plaintiff requested a special jury instruction, which the court denied. Plaintiff also failed to persuade the court to alter the special verdict form. The trial court charged the jury, and after deliberations, the jury returned a verdict in favor of Vanderbilt. The trial court entered a judgment in accordance with the jury verdict on March 16, 2015. The court subsequently denied Plaintiff's motion for new trial.

## II. ANALYSIS

On appeal, Plaintiff contends that the trial court erred in: (1) excluding evidence as hearsay; (2) overruling her objections to defense counsel's cross-examination of a witness concerning two three-dimensional models; (3) failing to instruct the jury to ignore statements made by defense counsel in closing argument; (4) refusing her request for a special jury instruction; and (5) declining to change the special verdict form. We will address each issue in turn, beginning with the challenges to the conduct of the trial.

## A. CONDUCT OF THE TRIAL

### 1. Exclusion of Email Messages

Before trial, Vanderbilt filed a motion in limine to prevent Plaintiff from introducing certain email communications between two former Vanderbilt doctors as evidence at trial on hearsay grounds. Prior to giving their deposition testimony, the two doctors had exchanged email messages about their recollections of Mr. Popick's care. One email message described a nurse's statement[6] that one of the doctors thought she might have overheard at the time of the bedside tracheostomy attempt.

---

[6] In her email message, Dr. MacNew wrote about her recollection of the bedside tracheostomy. She recalled perhaps hearing a nurse, Milton Higgenbotham, make a statement during the procedure:

> I don't remember if I was "scrubbed in" for the perc part. . . . I sorta remember walking around the corner hearing Milton yell "come on, ju[s]t put it in." That memory could be coming from a number of trachs however. Then packing up and going down to the OR for a level one.

The trial court granted Vanderbilt's motion, ruling that the email messages were hearsay, but gave Plaintiff the opportunity to use the evidence as a prior inconsistent statement. *See* Tenn. R. Evid. 613. The court also permitted Plaintiff to explore the circumstances surrounding the nurse's statement in an effort to establish that the statement met the requirements of the excited utterance exception to the hearsay rule. Tenn. R. Evid. 803(2).

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015). A court abuses its discretion when it applies an incorrect legal standard, reaches an unreasonable result, or bases its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). In reviewing the trial court's exercise of discretion, we presume that the decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013).

We conclude the trial court did not abuse its discretion in granting Vanderbilt's motion in limine. As out-of-court statements offered to prove the truth of the matter asserted, the email messages were clearly hearsay. Tenn. R. Evid. 801(c). Hearsay is not admissible unless it falls within an exception. Tenn. R. Evid. 802.

Plaintiff did not demonstrate that the excluded messages fit within any hearsay exception. The messages themselves were not admissible as admissions by a party-opponent because the doctors were no longer employed by Vanderbilt when the statements were made. *See* Tenn. R. Evid. 803(1.2) (providing a hearsay exception for an employee's statement "concerning a matter within the scope of the agency or employment made during the existence of the relationship under circumstances qualifying the statement as one against the declarant's interest regardless of the declarant's availability").

Plaintiff argues that Dr. MacNew's statements describing her recollections of Mr. Popick's case were inconsistent with her deposition testimony and therefore admissible to impeach her character for truthfulness. The trial court allowed Plaintiff to use the statements to the extent allowed by Rule 613 of the Tennessee Rules of Evidence.

Under Rule 613(a), a party may examine a witness concerning a prior inconsistent statement. Extrinsic evidence of the prior inconsistent statement, however, is not admissible "unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). Dr. MacNew did not testify at trial although her video deposition was shown to the jury. As Plaintiff did

9

not meet the requirements of Rule 613(b), Dr. MacNew's out-of-court statements were not admissible as extrinsic evidence of a prior inconsistent statement.

Even if Dr. MacNew's out-of-court statements were admissible, her email message also included an out-of-court statement of a Vanderbilt nurse. Thus, we are faced with hearsay within hearsay. "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule." Tenn. R. Evid. 805. Plaintiff contends that the nurse's statement was admissible as an excited utterance.

To qualify the nurse's statement as an excited utterance, the statement must relate to a startling event "made while the declarant was under the stress of excitement caused by the event." Tenn. R. Evid. 803(2). Plaintiff's only proof of a startling event is that the nurse may have yelled and the fact that Dr. Mowery declared a level one emergency when transferring Mr. Popick to the operating room after the failed bedside attempt.

Even if we assume that the nurse's statement was made during Mr. Popick's bedside tracheostomy as opposed to some other, we conclude that the excited utterance exception was inapplicable. The record does not contain sufficient evidence that Mr. Popick's bedside tracheostomy was a startling event. Dr. Mowery, the only witness with an independent memory of the bedside attempt, explained that he declared a level one emergency solely to obtain the necessary time in the operating room that day. He testified that Mr. Popick was not in danger as evidenced by the fact that his vital signs remained stable throughout both procedures.

2. Objections to Cross-Examination on Three-Dimensional Models

We next consider whether the trial court erred in overruling Plaintiff's objections to defense counsel's cross-examination of her expert witness, Dr. Reibel. During Dr. Reibel's direct testimony, Plaintiff introduced as exhibits two three-dimensional models of Mr. Popick's January and March CT scans. Dr. Reibel marked on the exhibit created from the March CT scan the area that he believed reflected a cricoid fracture. During cross-examination, defense counsel elicited the following testimony over Plaintiff's objection:

> Q. And because they were brought out in direct, these 3D models that have been put into evidence now, you didn't take part in creating those models. Is that correct?
>
> A. No, ma'am, I did not.

10

Q. It's just based on you having looked at the films and having looked at the models here today you think they are an approximate representation of what's shown on the films?

A. Yes, ma'am.

Q. And, in fact, they're a representation of your interpretation of the films. Is that correct?

A. Yes, ma'am.

Q. You interpret the films as showing a cricoid fracture --

A. Yes, ma'am.

Q -- is that correct? But you understand that there are other people in the case who disagree with that interpretation?

A. Yes, ma'am.

Q. So the 3D models are intended to be a representation of the plaintiff's interpretation of the films. Is that correct?

MR. CALLAHAN: Object to form of the question. That is not the prior evidence.

THE COURT: Sorry, your objection?

MR. CALLAHAN: Object – she's misstating the evidence in her question. That's my objection, Your Honor.

THE COURT: Overrule the objection.

Subsequently, Plaintiff argued to the trial court that the jury could be misled by defense counsel's questions into thinking the models were not anatomically accurate. Plaintiff had not brought the expert witness who created the models to testify as to their creation and authenticity based on Vanderbilt's representation that it would not challenge their authenticity at trial. According to Plaintiff, she could not counter the false impression left by defense counsel's questions without a corrective instruction or bringing the expert witness who created the models to court.

After a lengthy discussion with the trial court, Plaintiff's counsel agreed that a stipulation would cure any problem. The following stipulation was read to the jury:

11

The parties stipulate that Exhibit 28 is a three-dimensional model made from the CT dated January 17, 2008, and accurately depicts Mr. Popick's anatomy as shown on the CT. The parties stipulate that Exhibit 27 is a three-dimensional model made from the March 30th, 2008 CT and accurately depicts Mr. Popick's anatomy as shown on the CT. This stipulation does not apply to any markings made by witnesses on the exhibits or their opinions about the CT scans and the models.

On appeal, Plaintiff argues that the stipulation was inadequate, and the trial court committed reversible error. We disagree. "The propriety, scope, manner, and control of cross-examination of witnesses . . . [is] within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012); *see also Laseter v. Regan*, 481 S.W.3d 613, 625 (Tenn. Ct. App. 2014). The trial court did not abuse its discretion, and even if it had, Plaintiff agreed that the stipulation cured any alleged error. Under these circumstances, we conclude Plaintiff waived this issue.

3. Objections to Closing Argument

Plaintiff's next issue focuses on statements made by defense counsel during closing argument. Plaintiff objected at trial to the following:

But Dr. Spring wasn't the only plaintiff's expert, so let's look at what Dr. Reibel had to say. He's a pretty qualified guy. He's, you know, at the University of Virginia. Let's take a look at Dr. Reibel's opinions about the negligence of Dr. Burkey on June 16th. That's right. Nothing. An ENT physician, qualified ENT physician, does the same kind of work as Dr. Burkey, and he said nothing. Ladies and gentlemen, we submit to you that Dr. Reibel's silence about whether Dr. Burkey was negligent is deafening.

Plaintiff argued that defense counsel had agreed not to cross-examine or make any argument about why Dr. Reibel did not provide an opinion as to whether Dr. Burkey had met the standard of care. Defense counsel maintained that she had only agreed not to cross-examine Dr. Reibel on the topic. She claimed she never said she would not refer to his silence in closing argument. After listening to both sides, the trial court overruled the objection.[7]

---

[7] The record reflects that Plaintiff asked Dr. Reibel if there were any caveats to his willingness to review Mr. Popick's case. Defendant objected to the testimony as irrelevant, and after a bench

12

Plaintiff raised the issue of the defense counsel's statements in closing argument again in her motion for a new trial. In considering the motion and reflecting on its previous ruling, the trial court indicated that the statements of defense counsel may have been inappropriate even though defense counsel did not violate any agreement. And the court acknowledged it may have been error not to instruct the jury to disregard defense counsel's statement. Ultimately, however, the court denied the motion, determining any error was harmless. The court concluded that the jury verdict was supported by the evidence and the statements did not impact the verdict.

The trial court has broad discretion in controlling closing argument, and we review this issue under the abuse of discretion standard. *Stanfield v. Neblett*, 339 S.W.3d 22, 43 (Tenn. Ct. App. 2010). "Closing arguments allow counsel to present their theory of the case and to point out strengths and weaknesses in the evidence." *Id.* The trial court found that defense counsel did not violate any agreement when she suggested an inference the jury could draw from Dr. Reibel's silence. As also noted by the trial court, opposing counsel had an equal opportunity to highlight Plaintiff's case and to explain that Dr. Reibel was only retained to testify on certain issues. *See id.* at 44.

Even if defense counsel's argument was inappropriate, we will not order a new trial based on improper closing argument unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). We conclude that, in light of the entire record, defense counsel's statements did not affect the jury's verdict or prejudice the judicial process.

## B. SPECIAL JURY INSTRUCTION

We next consider the trial court's denial of Plaintiff's request for a special jury instruction. The trial court had a duty to instruct the jury regarding every factual issue and theory for recovery that was raised by the pleadings and supported by the evidence. *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 372 (Tenn. 2006). "Where a special instruction that has been requested is a correct statement of the law, is not included in the general charge, and is supported by the evidence introduced at trial, the trial court should give the instruction." *Spellmeyer v. Tenn. Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993).

On appeal, we review "the jury charge in its entirety and consider the charge as a whole in order to determine whether the trial judge committed prejudicial error."

conference, the trial court sustained the objection. Because the statements made at the bench conference are inaudible on the video transcript and were not transcribed or otherwise made available to this Court, we are unable to determine the scope of defense counsel's representation.

*Johnson*, 205 S.W.3d at 372.  We will not reverse the judgment unless "the improper denial of a request for a special jury instruction has prejudiced the rights of the requesting party."  *Id.*  Plaintiff must affirmatively show that the refusal to grant the requested instruction affected the result of the trial.  *Id.*

Plaintiff requested that the court instruct the jury that they could presume that an accurate procedure note would have been adverse to Vanderbilt if certain elements were proven.[8]  Plaintiff's request was a variation of Tennessee Pattern Jury Instruction 2.04, the so-called "missing evidence" instruction.  *Richardson v. Miller*, 44 S.W.3d 1, 27 (Tenn. Ct. App. 2000).  "[W]hen a party fails to introduce either an available witness or a

[8] Plaintiff requested that the court instruct the jury as follows:

Under certain circumstances you may consider the absence of evidence or a witness.  In this case, you may conclude that an accurate medical record describing what transpired at Mr. Popick's bedside during the attempt at a percutaneous tracheostomy would have been adverse to the defendant if you find all of the following elements:

1. That it was within the power of the defendant to produce an accurate medical record describing the events during the attempt to perform a bedside tracheostomy on January 23, 2008, but that the defendant has failed to do so; and

2. The production of an accurate medical record describing the events during the attempt to perform a bedside tracheostomy on January 23, 2008, was uniquely in the power of the defendant and could have been produced by the exercise of reasonable diligence; and

3. The ability to create an accurate medical record describing the events during the attempt to perform a bedside tracheostomy on January 23, 2008, was not equally available to the plaintiff; and

4. An accurate medical record describing the events during the attempt to perform a bedside tracheostomy on January 23, 2008, would not be merely cumulative; and

5. A reasonable person under the same or similar circumstances would have produced an accurate medical record describing the events during the attempt to perform a bedside tracheostomy on January 23, 2008, if the medical record would have been favorable; and

6. No reasonable excuse for the failure to do so has been shown. You must find all of these elements before you can conclude that an accurate medical record describing the events during the attempt to perform a bedside tracheostomy on January 23, 2008, would be adverse to the defendant.

piece of evidence which was in that party's possession and which would be 'capable of shedding light on a material contested issue,' a trial court may impose a negative inference that the missing evidence or witness 'would have been unfavorable to the party possessing it.'" *Tatham v. Bridgestone Americas Holding, Inc.*, 473 S.W.3d 734, 740 n.3 (Tenn. 2015) (quoting *Richardson*, 44 S.W.3d at 27-28)).

This Court has previously explained what must be demonstrated to warrant a missing evidence instruction.

> Where the missing evidence is a document, the party seeking the missing evidence instruction must demonstrate that the document existed and was in its adversary's exclusive control. The party must also demonstrate that the party possessing the document could have produced it. To avoid a missing evidence instruction, the party failing to produce a document in its possession must give a reasonable explanation for failing to produce it.

*Richardson*, 44 S.W.3d at 28 (citations omitted). An essential prerequisite to use of the missing evidence instruction is that the missing document actually existed and was not produced.

We conclude that the requested instruction was not warranted. Plaintiff did not demonstrate that Vanderbilt possessed an accurate bedside procedure note but failed to produce it. An inaccurate document is not equivalent to a missing document. Accordingly, the trial court properly refused to instruct the jury as requested.

## C. JURY VERDICT FORM

Finally, Plaintiff argues that the trial court's jury verdict form did not allow the jury to address her claim that Vanderbilt's negligence in performing a tracheostomy caused Mr. Popick's stenosis and eventual death. *See* Tenn. R. Civ. P. 49.01. Special verdict forms should parallel the issues covered by the jury charge. *Ingram v. Earthman*, 993 S.W.2d 611, 640 (Tenn. Ct. App. 1998). We review the jury instructions and the special verdict form together "to determine whether they present the contested issues to the jury in an unclouded and fair manner." *Id.* Although trial courts have wide latitude in the use of special verdict forms, we will order a new trial "when verdict forms are composed in such a faulty fashion that they do not address each of the plaintiffs' theories of recovery and do not allow the jury to adequately respond to each claim." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 911 (Tenn. 1999); *Stanfield v. Neblett*, 339 S.W.3d 22, 40 (Tenn. Ct. App. 2010).

15

Plaintiff had the burden of proving that Mr. Popick's injuries and death would not have occurred but for Vanderbilt's negligence. Tenn. Code Ann. § 29-26-115 (2012).[9] At trial, Plaintiff's expert witnesses testified that Vanderbilt negligently fractured Mr. Popick's cricoid cartilage and that fracture caused his injury. Vanderbilt's expert witnesses denied that the cricoid was fractured and opined that Mr. Popick's stenosis was a recognized complication of his non-negligent respiratory care. Accordingly, the trial court determined that whether the cricoid cartilage was fractured was a factual issue for the jury to decide.

The initial question in the special verdict form asked the jury to determine whether Mr. Popick's cricoid cartilage was fractured during the bedside tracheostomy attempt on January 23, 2008. Only if the jury found that Plaintiff had proven a fracture occurred, could the jury then consider whether the Vanderbilt doctors were negligent in performing the bedside procedure.

At the jury charge conference, Plaintiff argued that the initial question should be changed to allow the jury to consider Vanderbilt's negligence if the jury found that the cricoid cartilage was fractured *or otherwise injured*. The trial court denied the request based on the lack of proof that an injury to the cricoid less than a fracture caused Mr. Popick's stenosis.

Plaintiff contends that the trial court directed a verdict in favor of the defendant by limiting the jury's ability to consider the issue of Vanderbilt's negligence. The trial court agreed:

> The jury answering that factual interrogatory results in essentially the Court directing the verdict finding that you cannot recover. Not that there's no negligence, but that

---

[9] In a health care liability action, the plaintiff has the burden of proving by a preponderance of the evidence through an appropriate medical expert:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a).

there's an impossibility of recovery because you have no potential for proving causation.

We conclude that the trial court properly applied Tennessee law to the facts of this case. "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). Proof of negligence alone is not enough. *Id.* "[T]he plaintiff must still establish the requisite causal connection between the defendant's conduct and the plaintiff's injury." *Id.* at 599.

As explained by our Supreme Court,

> [P]roof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty.

*Id.* at 602. When the proof of causation has only reached the level of "pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.* (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985)).

We conclude that this record lacks sufficient material evidence for a jury to determine that an "otherwise injured" cricoid cartilage caused Mr. Popick's stenosis. Plaintiff's experts unanimously determined that the stenosis was caused by a fractured cricoid cartilage. Plaintiff's reliance on selected portions of the testimony from defense experts to establish another theory of causation is misplaced.

Although several defense experts testified that a high tracheostomy can cause subglottic stenosis, this testimony equated to a mere possibility, which is insufficient proof of causation. Dr. Mowery agreed that a high tracheostomy increased the risk of developing stenosis. Dr. Bumpous testified that the stenosis risk may be five to ten percent higher in patients with a high tracheostomy. Proof of a possible increased risk of developing stenosis does not establish the "required nexus" between Mr. Popick's injury and Vanderbilt's alleged negligence. *See id.*

According to Plaintiff, the defense expert witnesses also agreed that the white spot on the March CT scan was an abnormality caused by trauma or injury, and therefore, the jury could conclude that the cricoid cartilage had been otherwise injured. Plaintiff's

17

argument misapprehends the defense witnesses' testimony. Although these witnesses agreed that the white spot was probably caused by injury or trauma or, even more generally, the actions of the surgeons, each witness further explained that the injury or trauma to which they referred was the unavoidable injury and trauma associated with non-negligent respiratory care. As Dr. Bumpous testified, "[i]n a[n] absolutely precisely and appropriately performed tracheostomy or intubation, these complications can occur in spite of our best efforts."

Because the trial court properly determined that Plaintiff could only establish the requisite causation if the jury found that the cricoid cartilage was fractured, we find no error in the use of the special verdict form. The form addressed each of Plaintiff's theories of recovery and allowed the jury to consider and respond to each claim.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court and remand this case for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE

18